1832.

BOWDEN
v.
M'LEOD.

---

### Bowden and others vs. M'Leod and others,

The jurisdiction which chancery has over trusts may be exercised over the property or temporalities of religious societies, (whether incorporated or not) as being trust property ; and equity will see the trusts faithfully performed.

Where a religious society is formed or incorporated and a place of worship raised for the purpose of inculcating particular doctrines or worship, neither the officers nor a part of the congregation can set up a new faith there. This can only be done with the consent of all the members. If it be attempted and a member complain, this court will examine into the doctrines and restrain the new faith in such particular place. This does not act as a check upon liberty of conscience: for those who hold different principles can secede and form a new congregation.

While two parties in a congregation were trying to get the possession of the church and their disputes were under scrutiny of a synod, the court directed each party alternately to have the weekly use of the church.

January 28, 1833.

Jurisdiction over religious incorporations and societies.

THE bill in this cause was filed by the complainants, as members of the consistory of the reformed presbyterian congregation worshipping in Chambers Street in the city of New York,

against the defendants, to restrain them from interfering with the funds of the church or inviting or permitting a minister to occupy the pulpit or to interfere with the temporalities, unless duly accredited by the Southern Presbytery under the direction of the Eastern Synod and from using the church to the exclusion of the complainants. A temporary injunction had been granted; and the defendants were ordered to show cause why such an injunction should not be continued. In the mean time, an attempt was made by the defendants to install the Reverend John N. M'Leod as minister. The proceedings consequent upon this were incorporated in a supplemental bill. And the matter now came before the court upon the order to show cause and on other matter.

The original bill, after showing that the complainants, six in number, were members of the consistory of the reformed presbyterian church in Chambers Street, set forth that about twenty-eight years since the Reverend Alexander M'Leod was ordained and had since continued to be the pastor of the said church, and the congregation owned the house of worship and real estate connected therewith, which was estimated at twenty thousand dollars. The bill then explained the nature of the government and the discipline of the church; and charged that, notwithstanding the doctrine and usages of the said church, the said Alexander M'Leod caused the church in Chambers Street to be incorporated by an act of the legislature of the State of New-York in the year one thousand eight hundred and twenty : and the same was procured by him without his having previously submitted its provisions, objects or operations either to the people or the elders and deacons of the church in their consistorial capacity and without the general knowledge of the congregation. By this act, the consistory of the church, that is to say, the minister, elders and deacons were constituted trustees for life. It then stated, that in the course of last year the said Alexander M'Leod became indisposed and unable to attend to the duties of his office; and his son, the Reverend John N. M'Leod, was engaged to supply his place—but, while so engaged, was suspended from the ministry for improper

conduct by a sub-synod of the reformed presbyterian church ; and that, notwithstanding his suspension, he returned immediately and continued to occupy and would still do so, unless restrained by the court. The bill also charged, that the said John N. M'Leod had been aided in this course of conduct by the other defendants, being a majority of the said consistory, who had invited him to occupy the pulpit of the congregation and agreed to pay him a certain salary for his services—and had so paid him out of the funds of the congregation.

Affidavits were put in on the part of the defendants. It appeared by them, amongst other things, that the church could not act without being incorporated ; and, at a meeting of the consistory court at which three of the complainants were present, a resolution, assented to by them, was passed to procure an act of incorporation. That every method was used to make it known to the congregation ; and application was afterwards made to the chancellor for leave to mortgage the real estate of the church, which was granted ; and that the church had acted under this law for twelve years.

And it also appeared, that in the month of April one thousand eight hundred and thirty-two the eastern sub-synod convened ; and Mr. John N. M'Leod was appointed clerk. At this meeting a pastoral letter was submitted for the approbation of the sub-synod, portions of which were expunged by a majority of thirteen to twelve. The minority published the original draft. In November last, a number of the members of this sub-synod assembled for the purpose of passing censure upon those who published the draft. Nine ministers, together with a large number of lay members, protested against this meeting as irregular and as having been called contrary to presbyterian order. The remaining members organized themselves as the eastern sub-synod and called on the clerk, Mr. John N. M'Leod, to produce the documents. He refused, considering the meeting irregular ; and they suspended him. According to the usage and discipline of the church, such a suspension must be caused by the presbytery, an inferior judicatory of the church and of which the minister might be a member : and this tribunal

alone had jurisdiction in such a case. The sub-synod had only appellate jurisdiction. All the proceedings of this sub-synod, so considered illegal, had been protested against and appealed from to higher judicatories of the reformed presbyterian church, who were, then in a course of passing upon them.

An able and elaborate argument was made by the respective counsel.

*Mr. David Graham,* and *Mr. George Griffin* for the complainants.

*Mr. Charles C. King* and *Mr Hugh Maxwell* for the defendants.

THE VICE-CHANCELLOR. Before I proceed to examine the grounds upon which the injunction is asked for in this case, I deem it necessary to state how far the court of chancery can take cognizance of a case relating to a religious corporate body, and to show upon what principles and to what end its jurisdiction can be invoked.

The reformed presbyterian church or congregation in Chambers Street is a corporate body. It was originally founded for religious and charitable purposes ; and incorporated by a law of the state. The property or temporalities are to be managed by persons constituting the consistory ; who are also trustees. Now, over them and the property, considering it as a trust estate, this court has jurisdiction. It will interfere to prevent any abuse of the trust ; can compel the trustees, in other words, the consistory, to discharge their duties fairly with respect to the property ; has power to remove them, if found necessary ; will preserve the temporalities and appropriate them to the original object of the institution—in short, see that the trusts are faithfully performed and executed. It is to this end the power, which is a common law one and inherent in the court, is used. Besides this, it has powers conferred by statute over corporations and their directors and managers : 2. *R. S.* 462. and 466 ; but those statutory powers do not extend to religious corporations.

Except in connection with the property and temporalities of a religious society, whether incorporated or not, and upon the principle just stated, this court has no jurisdiction and cannot interfere. It has nothing, immediately, to do with their spiritual concerns, church government, discipline, faith, doctrines or modes of worship. These are matters which are to be left to the regulation of their own peculiar tribunals and the ecclesiastical judicatories of each church. Nor will this court interfere to restrain the free exercise of religion in any man according to the dictates of his own conscience. It disclaims all such power and authority.

And yet, it must be admitted, there are cases in which this court has power to enquire into tenets openly and publicly expressed in reference to the *place* in which they are promulgated. The task may be a difficult and painful one; but equity can do this, whenever called upon (in connection with it) to execute or administer a trust. As, for instance, where a religious society is formed, a place of worship provided and either by the will of the founder, the deed of trust through which the title is held or by the charter of incorporation, a particular doctrine is to be preached in the place and the latter is to be devoted to such particular doctrine and service. In such a case, it is not in the power of the trustees of the congregation to depart from what is thus declared to be the object of the foundation or original formation of the institution and teach new doctrines and set up a new mode of worship there. At least, this cannot be done without the consent of all the members of the church or congregation, because it would be an infraction of the will of the founder, be contrary to the spirit of the deed or act of incorporation and a perversion of the original object and design of its institution. Upon the complaint of any party aggrieved, it may be made the duty of this court to enquire into the doctrines taught: with a view to ascertain whether there is such a departure and to restrain and bring them back to the original principles of faith and doctrine, if they will continue to worship in that place. This has been repeatedly done by the court of chancery in England:

see *Davis* v. *Jenkins*, 3. *Ves.* & *B.* 151 ; *Attorney Gen.* v. *Pearson*, 3. *Meriv.* 353 ; and *Foley* v. *Wontner*, 2. *Jac. & W.* 245. In the last mentioned case, the doctrines which originally, by agreement were to have been inculcated were not adhered to by all the congregation ; for some of the members had changed their religious opinion. Lord Eldon acknowledged the difficulty of acting in such a case : yet he took it to be settled, by a case in the house of lords on an appeal from Scotland, that the chapel or place of worship must remain devoted to the doctrines originally agreed on. It is to be observed, there is nothing in the exercise of this power to restrain the liberty of conscience. Those who change their opinions can secede and form a new congregation or society and worship elsewhere in the way which may best comport with their own religious belief.

Having thus explained the views which I entertain of the jurisdiction and authority of this court in relation to these matters, I proceed to examine the grounds on which it is sought to bring the present case under its cognizance.

The first ground alleged in the original bill is, the obtaining the special act of incorporation, contrary to the established doctrine of the church. Much has also been said as to the impropriety of the manner in which it was obtained. This ground entirely fails the complainants. It is shown there was no impropriety in it. The affidavits expressly aver its being procured with the consent of the elders and deacons and that the complainants themselves were instrumental in obtaining the act of incorporation. But, even were it otherwise, still this court could not interfere. It was an act of the legislature ; granting a franchise : which cannot be disturbed, except upon a violation of its terms. If it has been improperly obtained, the remedy must be found elsewhere.

The next ground is, that the Rev. John N. M'Leod was permitted to officiate as minister by the authority of the defendants against the will and remonstrance of the complainants. It is contended that he, from having been suspended by the direction of the eastern synod, could not lawfully be permitted to

1833.

BOWDEN
v.
M'LEOD.

75

officiate or be a trustee, in other words, one of the consistory; and that, consequently, it was necessary for this court to interfere in relation to the temporalities.

With regard to the suspension : much depends upon the effect of it. One party says it is irregular; that it operates against Mr. John M. M'Leod only as clerk of the sub-synod, and not as minister; that it was a resolution and not a sentence; and that it has been disapproved of and regarded as a nullity by the western presbytery to which he belonged, as well as by the Philadelphia presbytery under whom the church was subsequently placed. It is also shown to be in a train of investigation before the higher judicatories of the church. On the other hand, it appears that the suspension has been approved of by the southern presbytery within the bounds of which the church was contained; and that it has justified the complainants in adhering to and being governed by this act of the synod.

Under these circumstances and seeing that the result of the investigations in the higher ecclesiastical tribunals is yet uncertain, it can hardly be expected of this court to come to a decision upon them now. As these are questions of church government and discipline, it is proper and discreet in the court to wait for the final result of the investigation. It will then be fully competent to decide on the matters.

Another subject, which has given rise to much discussion, is the pastoral letter, published in phamphlet form. I shall not go into this enquiry at present, nor attempt to settle the questions arising from it. It is unnecessary for the purposes of the present motion.

When I recur to the circumstances before noticed and look to the matters of the supplemental bill, I am confirmed in the opinion that I must wait the result of the higher judicatories of the reformed presbyterian church before I undertake to decide definitely whether John N. M'Leod is to be regarded as one of the regular consistory and a trustee and also whether his adherents in the consistory have forfeited their right to be thus regarded. The general synod, when they convene, must certainly possess competent authority to correct whatever abuses

or irregularities may have occurred in any part of these trans-
actions.

I can only lament, in common with the friends of religion
every where, that such things should have happened. The
cause of religion generally suffers by such feuds and schisms.
It is to be hoped that when these matters come to be investi-
gated, where I shall leave them for the present, the parties now
before me may forget their asperities towards each other and
be again united, as they have hitherto been, in the bonds of
christian fellowship.

In the mean time I shall interfere to a certain extent. Un-
der the present circumstances it is not right that one party
should have the entire use of the temporalities of the church
to the exclusion of the other. So long as they continue to dis-
agree and until the questions which agitate this congregation
can be determined by the general synod, I shall order that the
complainants and their adherents be permitted to use and
occupy the church one half of the time, that is, alternately with
the defendants and their adherents; that each be at liberty to
employ such person to officiate as minister as they may think
proper; and that the defendants be enjoined from disturbing
the complainants in such use and enjoyment of the temporali-
ties of the church. And, if necessary, a receiver of the income
and pew rents can be appointed, to be held subject to the fur-
ther order of the court.