JACOB KUNS *et al.*

*v.*

J. W. ROBERTSON *et al.*

394:38 L.R.A. 69£

*Filed at Ottawa January 15, 1895.*

1. RELIGIOUS SOCIETIES—*effect of long acquiescence in church consti-tution.* A church constitution generally acquiesced in by the official bodies and members as the supreme law of the. church for many years, during which no legal steps were taken to determine its val-idity, will not be declared void by a court, even upon clear proof of irregularity in its adoption, except when justice, morality or pub-lic policy requires it.

2. SAME—*secular courts cannot determine questions of doctrine and prac-tice.* All questions of doctrine, practice and jurisdiction within a church must be determined 'by the church judicatures, and the secular courts of this State have no authority to adjudicate upon them.

3. SAME—*when decision of church court is final.* The decision of the highest legislative and judicial body of a church that an old con-fession of faith and constitution had been superseded by a new one, is conclusive upon the civil courts.

4. SAME—*ground of equitable interference.* To justify interference by a court of equity with the action of church authorities because of deviation from the standards of faith, such deviation should be so palpable and unequivocal as to enable the court, from an exam-ination of the historical and doctrinal practices of the church, to say that there has been an essential change in fundamental doc-trine.

5. EVIDENCE—*burden of proof as to title to church property.* A fac-tion of a religious society has the burden of establishing title to church property which has been in possession of trustees represent-ing the other faction and their predecessors in office for more than twenty years continuously.

APPEAL from the Circuit Court of Livingston county; the Hon. THOMAS F. TIPTON, Judge, presiding.

C. C. STRAWN, and A. C. NORTON, for appellants :

If the general conferences of 1885 and 1889, in their action as to the confession or constitution, either, first, had no jurisdiction; or, second, failed to act in conformity to the church law; or, third, if their action was *mala fides*, their proceedings are void.

Even in matters of purely ecclesiastical cognizance civil courts will protect parties from the operation of ecclesiastical decrees rendered without notice to them and an opportunity to be heard. *Green* v. *African M. E. Church*, 1 S. & R. 254; *Runkle* v. *Winemuller*, 4 Har. & McH. 429; *Brosius* v. *Reuter*, 1 H. & J. 551; *Thompson* v. *Reh. Cong. Soc.* 7 Pick. 160; *Seibert's case*, 3 Barr, 291; *O'Hara* v. *Stark*, 90 Pa. St. 488; *Gray* v. *Christian Society*, 137 Mass. 327; *Hess* v. *Bartlett*, 63 Am. Dec. 776, notes; *Commonwealth* v. *The Pa. etc.* 2 S. & R. 141; *Doyle* v. *N. Y. etc.* 3 Hun, 360; *Commonwealth* v. *Green*, 4 Whart. 603; *Freer* v. *Fidelity Lodge*, 6 Pa. C. C. 435; *Boulden* v. *Alexander*, 15 Wall. 131; *Wood* v. *Wood*, L. R. 9 Exch. 190; Hirschl on Law of Fraternities, 51-58; High on Ex. Legal Rem. sec. 298; Stevrick on Unincorporated Associations, 52; *Sale* v. *First Baptist Church*, 60 Iowa, 26.

The *onus* is on those asserting the sufficiency of the vote, to prove that due notice was given and that the vote was had. Innes on Law of Creeds, 348; *Chase* v. *Cheney*, 10 Am. Law Reg. (N. S.) 312; *Earl* v. *Wood*, 8 Cush. 467; *Harrison* v. *Hoyle*, 24 Ohio St. 254.

The rule that where notice is necessary every member must be notified, has recently been declared to be applicable to both select and indefinite bodies of public corporations. *Rex* v. *Feversham*, 8 T. R. 356; *Rex* v. *Langhorne*, 4 A. & E. 538; *People* v. *Peck*, 11 Wend. 694; *Am. Prim. Soc.* v. *Pellings*, 4 Zabr. 653; *Christ's Church* v. *Woodward*, 21 Me. 172; *Stevens* v. *Society*, 12 Vt. 688; Morawetz on Private Corp. sec. 357; 1 Potter on Corp. 339; *Stevens* v. *Eden Meeting House*, 12 Vt. 688; *Wiggins* v. *Free Will Baptist Society*, 8 Metc. 301; *People* v. *Batchledor*, 22 N. Y. 128; *Insurance Co.* v. *Westcott*, 14 Gray, 440; Angell & Ames on Corp. chap. 14.

Without notice jurisdiction can not exist. *Chase* v. *Cheney*, 10 Am. Law Reg. (N. S.) 311, note.

When, as in this case, the law of the church is plain, clear and explicit—"two-thirds of the whole society,"—

there is no authority to ignore and nullify it. Nullification is not construction—it is destruction. *Railroad Co.* v. *United States,* 92 U. S. 751; *Rex* v. *Burrell,* 12 A. & E. 46.

A constitution or organic law of government cannot be imposed on this society without the consent of every individual member of the society, either expressed or implied by acquiescence. *Burges & Stock's case,* 31 L. J. Ch. 749; *Livingston* v. *Lynch,* 4 Johns. Ch. 573; *Pickering* v. *Stephenson,* L. R. 14 Eq. 340; *Kean* v. *Stockton,* 9 N. J. Eq. 407; *Miller* v. *Ewer,* 27 Me. 509; *Ormsby* v. *Railroad Co.* 56 N. Y. 623; *Mowery* v. *Railroad Co.* 4 Biss. 86; *Railroad Co.* v. *Collins,* 40 Ga. 617; *Railroad Co.* v. *Harris,* 27 Miss. 537; *Stevens* v. *Railroad Co.* 27 Vt. 546; *Zabriskie* v. *Railroad Co.* 18 N. J. Eq. 178; *Black* v. *Canal Co.* 29 id. 467; *Hoey* v. *Henderson,* 32 La. Ann. 1069; *Tuttle* v. *Railroad Co.* 35 Mich. 247; *Clearwater* v. *Meredith,* 1 Wall. 25; *Pearce* v. *Railroad Co.* 21 How. 441.

Nothing is to be presumed in favor of the regularity or validity of the action of the commission or of the general conference in making changes in the constitution. The language of the power given must be strictly followed. *Harbeck* v. *Toledo,* 11 Ohio St. 222; *Railroad Co.* v. *Marenall,* id. 500; *Mallett* v. *Gold Mining Co.* 90 Am. Dec. 484; 2 Dillon on Mun. Corp. 705-610; Cooley on Taxation, 418; *Piper* v. *Pearson,* 61 Am. Dec. 438, and note; *Thatcher* v. *Powell,* 6 Wheat. 119; *Boswell* v. *Otis,* 9 How. 336; *Grignon* v. *Ashton,* 2 id. 319; *Treadwell* v. *Commissioners,* 11 Ohio St. 190; *Anderson* v. *Commissioners,* 12 id. 642; *Keys* v. *Williamson,* 21 id. 563; *Newell* v. *Cincinnati,* 45 id. 425; *Lessee of Adams* v. *Jeffreys,* 12 id. 272; *Lima* v. *Cemetery,* 42 id. 129; *Allentown* v. *Henry,* 73 Pa. St. 404; *Smith* v. *Davis,* 30 Cal. 536; *Taylor* v. *Donner,* 31 id. 480; *Chambers* v. *Satterlee,* 40 id. 497; *Railway Co.* v. *Galt,* 133 Ill. 668; *Moore* v. *Cline,* 47 Md. 565; *Anderson* v. *Gray,* 134 Ill. 554.

The courts may properly take judicial notice of the differences between religious doctrine embodied in confessions of faith. Courts will not pretend to be more ignorant than the rest of mankind. *Humphrey* v. *Burnside,*

4 Bush, 215 ; *Youngs* v. *Ransom,* 31 Barb. 49 ; *Burdine* v. *Grand Lodge,* 37 Ala. 478.

The constitution and confession of faith are as fully a part of every trust deed conveying church property as if therein written. *Watson* v. *Jones,* 13 Wall. 679 ; Greenleaf on Evidence, sec. 294 ; *Bird* v. *St. Mark's Church,* 91 Iowa, 572; *Green* v. *Biddle,* 8 Wheat. 92 ; *Bronson* v. *Kinzie,* 1 How. 319 ; *McCracken* v. *Hayward,* 2 id. 612 ; *People* v. *Bond,* 10 Cal. 570 ; *Ogden* v. *Sanders,* 12 Wheat. 231 ; *Von Hoffman* v. *Quincy,* 4 Wall. 550.

When rights of property are violated by the unconstitutional acts of the higher ecclesiastical courts, the parties aggrieved are entitled to relief in the civil courts. *Watson* v. *Avery,* 2 Bush, 332 ; 1 Waterman on Law of Corp. secs. 19, 84; *Grimes* v. *Harmon,* 35 Ind. 198 ; *Feigle* v. *Trustees,* 9 Kan. 595 ; Niblack on Mutual Benefit Societies, p. 155, sec. 133 ; Perry on Trusts, 734; Hoffman's Law of the Church, 480 ; Angell & Ames on Corp. 38, note; *Logan Tribe* v. *Schwartz,* 19 Md. 565 ; Hirschl on Fraternities and Societies, 40 ; *Torrey* v. *Baker,* 1 Allen, 120 ; *Birmingham* v. *Gallagher,* 112 Mass. 190.

An ecclesiastical court must be considered one of special and limited jurisdiction. Everything necessary to give validity to the judgment must be shown by oral proof. *Smith* v. *Nelson,* 18 Vt. 511; *Robertson* v. *Bullions,* 9 Barb. 64; *Baptist Church* v. *Witherell,* 3 Paige, 297; *Gable* v. *Miller,* 10 id. 627; 2 Denio, 492 ; *People* v. *Steele,* 2 Barb. 397; *People* v. *Stevens,* 5 Hill, 616 ; *Watson* v. *Avery,* 2 Bush, 398 ; *Sutter* v. *Dutch Reformed Church,* 42 Pa. St. 503 ; *German Reformed Church* v. *Seibert,* 3 id. 282.

The judgments of ecclesiastical organizations are only binding when arrived at in accordance with the rules and regulations of the particular church, and conducted regularly, *bona fide,* and with impartiality. *Watson* v. *Avery,* 2 Bush, 336 ; *Garten* v. *Penick,* 5 id. 110 ; *Fulton* v. *Farley,* 9 Am. Law Reg. (N. S.) 401; *Watson* v. *Garvin,* 54 Mo. 353 ; *Smith* v. *Nelson,* 18 Vt. 511; *Green* v. *African M. E.*

*Church,* 1 S. & R. 254; *Commonwealth* v. *Green,* 4 Whart. 603; *Runkle* v. *Winemuller,* 4 Har. & McH. 429; *Brosius* v. *Reuter,* 2 H. & J. 551; *Thompson* v. *Rep. Cong.* 7 Pick. 160; *Shannon* v. *Frost,* 3 B. Mon. 257; *Seibert's case,* 3 Barr, 291.

Matters of discipline, only, are not regarded as affecting church trusts,—matters of doctrine are. This distinction is recognized in all the cases. *Trustees* v. *Trustees,* 3 Green's Ch. 79; *Fell* v. *Read,* 3 Ves. 69; *Beatty* v. *Kurtz,* 2 Pet. 579; *Presbyterian Church* v. *Executors,* 1 Eq. 154; *McGinnis* v. *Watson,* 41 Pa. St. 9; *Cannajoharie Church* v. *Leiber,* 2 Paige's Ch. 43.

The decisions of ecclesiastical tribunals are not conclusive on civil courts, and it is the duty of courts to preserve trust property for the purposes of the trust. *Smith* v. *Smith,* 2 Dessaus. 537; *Commonwealth* v. *Fisk,* 8 Metc. 233; *People* v. *Farrington,* 22 How. 295; *Craigallie* v. *Aikman,* 2 Bligh, 529; 6 Craigie & Stewart's H. L. Appeals, 626; Innes on Law of Creeds, 328; *Galbraith* v. *Smith,* 15 Shaw, 808; *Kirkintillock case,* 12 Dunlop, 523; *Forbes* v. *Eden,* L. R. (1 S. & Div. App.) 568; *Garten* v. *Penick,* 5 Bush, 110.

The question which is the true church does not depend on the name which the seceders may adopt for themselves. Things are known by what they are, not by what they are called. *Venable* v. *Coffman,* 2 W. Va. 320; *Hendricson* v. *Decow,* 1 Sax. Ch. 577; *Field* v. *Field,* 9 Wend. 394; *Baker* v. *Fales,* 16 Mass. 488; *Hale* v. *Everett,* 53 N. H. 9; *Altman* v. *Bene,* 27 N. J. Eq. 331; *Gibson* v. *Armstrong,* 7 B. Mon. 500; *Harper* v. *Strauss,* 14 id. 48.

GEORGE W. PATTON, and GUNCKEL & ROWE, for appellees:

The power to enact is a power to repeal, and any law passed may be amended or repealed by the same body which enacted it. *Wall* v. *State,* 23 Ind. 153; *State* v. *Oskins,* 28 id. 364; *State* v. *Swift,* 69 id. 520; *Richards* v. *Congregational Society,* 58 N. H. 187; *Smith* v. *Nelson,* 18 Vt. 512.

The word "forever," in a statute, not amounting to a contract, is to be understood as meaning, simply, until changed by law.   Endlich on Stat. Const. sec. 173, and cases cited; *Bloomer* v. *Stolly*, 5 McLean, 158; Cooley's Const. Lim. 129; *Plank Road* v. *Husted*, 30 Ohio St. 581; *Harrison* v. *Doyle*, 24 id. 301; *Mongeon* v. *People*, 55 N. Y. 613; *Mott* v. *Railroad Co.* 30 Pa. St. 927; *Commonwealth* v. *Mayor*, 5 Watts, 152; *Wardens* v. *Pope*, 8 Gray, 140; *Kellogg* v. *Oshkosh*, 14 Wis. 623; *Brightman* v. *Kivner*, 22 id. 55; *Morgan* v. *Smith*, 4 Minn. 67; Angell & Ames on Corp. 459; 3 Am. & Eng. Ency. of Law, 691.                                        \

The correctness of the decision of the canvassers will not be investigated in a collateral proceeding, but must be conclusively presumed to be correct.   Cooley's Const. Lim. 787, and cases cited; *Carroll County* v. *Smith*, 111 U. S. 555.

Two-thirds of those who voted is two-thirds of the whole society.   *Cass County* v. *Johnson*, 95 U. S. 369; *Carroll County* v. *Smith*, 111 id. 556; *St. Joseph* v. *Rogers*, 16 Wall. 663, and cases cited; *County* v. *Johnson*, 5 Otto, 369; *Green* v. *Weller*, 32 Miss. 850; McCrary on Elections, sec. 173; *Const. Prob. Amd't cases*, 24 Kan. 700; *Dayton* v. *St. Paul*, 22 Minn. 400; *Miller* v. *English*, 21 N. J. L. 317; *Madison Avenue Church* v. *Baptist Church*, 2 Abb. Pr. (N. S.) 234; *People* v. *Gaines*, 47 Ill. 246; *People* v. *Warfield*, 20 id. 163; *Railroad Co.* v. *Davidson*, 1 Sneed, 692; *Bridgeport* v. *Railroad Co.* 15 Conn. 475; *Melvin* v. *Lisenby*, 72 Ill. 63; *Taylor* v. *Taylor*, 10 Minn. 107; *State* v. *Lancaster*, 6 Neb. 474; *Wardens* v. *Pope*, 8 Gray, 140; *Walker* v. *Oswald*, 68 Md. 146.

The decision of the general conference is final and conclusive.   *Commonwealth* v. *Green*, 4 Wheat. 531; *Watson* v. *Jones*, 13 Wall. 679; *Bouldrin* v. *Alexander*, 15 id. 131; *Gaff* v. *Greer*, 88 Ind. 122; *White Lick Quaker case*, 89 id. 136; *Grimes* v. *Harmon*, 35 id. 198; *O'Donovan* v. *Chatard*, 97 id. 421.

Reference to the discipline shows that the contract of membership was belief in and adherence to the bible, and

not the confession of faith.    To forfeit rights there must be a radical change in faith and practice.    *Lutheran Congregation* v. *St. Michael's Church*, 48 Pa. St. 20 ; *McGinnis* v. *Watson*, 41 id. 9 ; *Ramsey's Appeal*, 88 id. 60 ; *First Presbyterian Church* v. *Wilson*, 14 Bush, 252 ; *Miller* v. *Gable*, 2 Denio, 493.

Per CURIAM : As we view this record, the question of whether the old constitution of 1841 was or was not duly enacted and the valid organic law of the church of the United Brethren in Christ is not deemed necessarily essential to a decision of this case.    While some doubt seems to have existed in the councils of the church as to the regularity of its adoption and binding force, and elaborate arguments have been presented upon the question by counsel on both sides, it must suffice to say, that though it be conceded to have been irregularly adopted as the fundamental law, yet it seems reasonably clear that it was generally acquiesced in by the several official bodies and members of the church for very many years, and until 1889, as the supreme law of that religious organization, and it would now be a useless if not fruitless task to enter upon an examination and discussion of the history of the church pertaining to the origin, process of adoption and subsequent acts of ratification of that instrument.    After such a lapse of time, during which, it seems, no legal steps were taken toward having the validity of the constitution judicially determined, a court would, in view of the continued acquiescence, even upon the clearest and most satisfactory proof of irregularity in its adoption, be loth to declare it void, and would be warranted in doing so only when required by the principles of substantial justice, morality or public policy,— and this upon the familiar doctrine, that while equity will not suffer a wrong without a remedy, it will not lend its aid to impeach transactions long acquiesced in or confirmed, nor to aid demands which have become stale from the lapse of time.    (2 Pomeroy's Eq. Jur. secs. 964, 965 ;

1 id. secs. 418, 419.) That instrument may not have been a constitution, in the technical signification and meaning of that term, as it perhaps did not contain the body of the rules and maxims in accordance with which the sovereign powers of the church were to be habitually exercised, (Cooley's Const. Law, 21; *Van Horne* v. *Dorrance*, 2 Dall. 308; Duer on Const. Jur. 26;) and all the formalities requisite to the making of an instrument of that high character may not have been strictly performed. Nevertheless, that instrument, of whatsoever nature it might be regarded, did operate as a binding compact between the church and its members, (*Presbyterian Church* v. *Wilson*, 14 Bush, 278,) and was recognized by the official bodies, in all transactions relating to the welfare or polity of the church, as obligatory upon them. On account however, of its indefinite, incomplete and restricted character it became illy adapted to a large and prosperous church, which, within much less than the half century after its adoption, had grown until the membership numbered hundreds of thousands, distributed over many States and possessing much valuable property. "A constitution," says Judge Cooley, in speaking of a political, organic law, "is valuable in proportion as it is suited to the circumstances, desires and aspirations of the people, and as it contains within itself the elements of stability, permanence and security against disorder and revolution."

For many years prior to 1889 there had been a dispute in the church, gradually increasing in intensity and vigor, in respect of certain matters of church polity. These were, the questions of lay representation, ratio of representation, and the attitude of the church toward secret societies,—the latter exciting, doubtless, the greatest interest and the bitterest controversy. The constitution (sec. 7, art. 4,) on that subject provided, "there shall be no connection with secret combinations," and the fatal objection to it was, that the language was too broad, unre-

154—26

stricted and unqualified, and that no matter what the
nature of the society,—however moral in principle, laud-
able in undertaking or worthy of emulation,—if it were
"secret" it was obnoxious to said provision.    Within the
last quarter of a century the growth and increase of
social organizations having for their objects the distri-
bution of charity, the care of widows, orphans and the
helpless, and for the benefit of humanity in general,—all
prompted by the purest and highest motives,—and which
hold their meetings and deliberations under solemn obli-
gations of secrecy, have been almost phenominal.    It
would seem unreasonable to say that the provision was
intended to be applicable to societies of this character,
and, if so intended, in harmony with the advanced senti-
ment and thought of the church.    It was also contended
by the radical element of the church, that under the con-
stitution of 1841 there could be no alteration of that in-
strument "unless by request of two-thirds of the whole
society," and no rule or ordinance "at any time passed to
change or do away with the confession of faith."    How-
ever, under discussion, coupled with the constant growth
and development of the church, the disposition toward
liberty in respect of matters above referred to, and the
idea that the constitution of 1841 and confession of faith
were susceptible of amendment and improvement, both
developed and grew, so that in 1885 the liberal element
had demanded a revision of the confession of faith and
an amendment of the constitution, and steps were taken
to that end.

     At the general conference of the church which con-
vened at Fostoria, Ohio, May 14, 1885, the committee on
revision, comprising thirteen members of the conference,
to which was referred the question of revising the con-
fession of faith, the constitution and section 3 of chapter
10 of the discipline, (against connection with secret so-
cieties,) made its report, signed by eleven members of
the committee, finding that the clauses above quoted,

inhibiting change in the confession of faith and alteration of the constitution, "are, in their language and apparent meaning, so far-reaching as to render them extraordinary and impracticable as articles of constitutional law;" that said constitution had acquired force only by the partial and silent assent of the church, and that "it is the sense and belief of your committee that the constitution, as it stands, is not in harmony with the present wishes of our people, as has been indicated in discussions, petitions and elections during the past year," and recommending the adoption by the conference of resolutions contained in the report, providing for a "church commission," consisting of twenty-seven members, the powers and duties of which should be "to consider our present confession of faith and constitution, and prepare such a form of belief, and such amended fundamental rules for the government of this church in the future, as will, in their judgment, be best adapted to secure its growth and efficiency in the work of evangelizing the world, provided, first, that this commission shall preserve unchanged, in substance, the present confession of faith so far as it is clear; second, that it shall also retain the present itinerant plan; third, it shall keep sacred the general usages and distinctive principles of the church on all great moral reforms, as sustained by the word of God, in so far as the province of their work may touch them." Said commission was to complete its work by January 1, 1886, and prepare and execute a plan by which the revised confession of faith and amended constitution should receive the largest possible attention and expression of approval and disapproval of the people, including all necessary regulations for taking, counting and reporting the vote, and that "when, according to the foregoing provisions, the result of the vote of the church shows that two-thirds of all the votes cast have been given in approval of the proposed confession of faith and constitution," it should be the duty of the bishops to pro-

claim the result through official organs of the church. This report of the committee was adopted, (two of said thirteen members thereof making a minority report,) and said church commission elected by the conference accordingly. This church commission completed its labors within the time allotted, and it seems 'that all facilities, in the way of public discussions through the press of the church and other means at its command, were used to fully acquaint the membership at large with the subject matter.

In November, 1888, pursuant to a "plan of submission," which, as we have seen, said church commission was authorized to prepare without further sanction from the general conference, an election was held, identical in time with that for the election of delegates to the general conference of 1889, at which the popular will of the church was to be expressed by printed ballots. Said ballots contained appropriate head lines, and the amendment and other propositions to be voted upon, viz.: "Confession of faith," "amended constitution," "lay delegation," and "section on secret combinations," and opposite each proposition was printed the word "Yes," which the member desiring to vote against either of the said propositions was instructed, by the ballot, to erase and insert in lieu thereof the word "No." The vote cast was overwhelmingly in favor of said propositions, and at the general conference in May, 1889, said church commission reported its revised confession of faith, amended constitution, its plan of submission thereof to the laity, the vote cast for and against, and the result thereof, all of which were submitted to the conference. Thereupon the conference, on motion, selected a special committee to ascertain whether the commission had "acted in compliance with the instructions of the general conference," and whether the vote of the church had been orderly and regular, and also to recommend to the conference such action it might deem proper to be taken in the premises. Pursuant to

instructions, this special committee, on the following day (May 11) made its report, in all things confirming the report of such church commission, and finding that it had followed its instructions with fidelity, and had, by its appropriate "plan of submission," received approval of its work by the membership of the church, and recommending the adoption by the conference of the resolution reported, thereby approving and confirming "the proceedings of said church commission, including the revised confession of faith and amended constitution, as formulated, and all other acts by which the will of the church was ascertained thereon, and that by reason of the fact that said revised confession of faith and amended constitution, as a whole, had been approved by more than two-thirds of all the votes cast thereon, as required by the general conference of 1885, it be "hereby declared and published * * * that the said revised confession of faith and amended constitution, as framed and submitted, * * * are become the fundamental belief and organic law of the church of the United Brethren in Christ, and will be in full force and effect on and after the 13th day of May, A. D. 1889, upon the proclamation of the bishops," as therein prescribed, etc., which proclamation was subsequently made accordingly. This report, including said resolution, was adopted by the conference by a vote of 110 yeas to 20 nays. At this juncture the Rev. Milton Wright, and some fourteen others of the twenty voting nay, withdrew from the conference and met in separate conference in the same city. They proceeded to declare that by the proceedings of the conference they had lately deserted a new church had been formed, and that the said 110 delegates voting as aforesaid had thereby vacated their seats as members of the general conference of the church, and they then assumed and claimed their organization to be the true general conference of the church, with authority to hold and manage the property, affairs and business of the church. The original conference,

composed of 115 members, at the same time continued its deliberations.

The effect of this division and rivalry was to produce factions in local congregations, those adhering to the old confession and constitution being generally in the minority. In some local congregations the rivalry has been so bitter that one or the other of the factions has appealed to the courts in the various States, and such is the origin of this litigation. In the Hoobler Chapel Congregation of New Michigan, one faction, appellants, adhere to the old confession and constitution, claiming to be members, trustees, etc., of the true church, and entitled to the possession and control of the local church properties and affairs, and the other faction, represented by appellees, and largely in the majority, make a like claim under the revised confession and amended constitution, and the latter being in the possession and control of the church properties and affairs, the former seek by the bill to establish the trust and right of possession in themselves in the local church property, and to enjoin the latter from interfering with them in the exercise of said trust and the possession and enjoyment of said property, the ground alleged being, that said revised confession of faith and amended constitution, and the proceedings by which the same were made and adopted, are irregular and void, and that, as such, they have no binding force on the true church of the United Brethren in Christ, of which appellants claim to be officers and members under the confession of faith of 1815 and constitution of 1841. And the question presented is, which party or faction, as representatives and members of the church of the United Brethren of New Michigan, are entitled to possession and control of the church property in question.

The "Hoobler Chapel Congregation" of the church of the United Brethren came into existence about the year 1866, and the property described in the bill as owned by said local society was deeded to the "trustees of the

church of the United Brethren in Christ, and their suc-
cessors in office of the church in New Michigan, of the
county of Livingston, and State of Illinois." Subse-
quently, upon the two several parcels of ground so deeded
to the church, the local congregation built a church build-
ing for worship, and a parsonage, to be occupied as a
residence by the minister, which have continued to be so
used ever since. The membership of said congregation
at the time of bringing this suit, it seems, was about
sixty, twelve of whom adhered to the old confession and
constitution. Appellees and their predecessors in office
have been in continuous possession for more than twenty
years prior to the filing of this bill, and the burden of
proof therefore rested upon complainants to establish
their title to the premises.

However interesting it might be for us to dwell upon
and elaborate many of the questions raised in this case, no
useful purpose would be served by so doing. In respect
of the questions as to whether the revised confession of
faith and amended constitution, and the proceedings by
which the same were made and adopted, were or were
not legal and binding upon appellants as the fundamental
principles and organic law of the church of which they
claim to be members, we shall refer to recent cases de-
termined by courts of very high respectability as conclu-
sive upon the subject.

In *Schlichter et al.* v. *Keiter et al.* 156 Pa. St. 119, the iden-
tical questions here involved were presented and deter-
mined, and that court, by WILLIAMS, J., in passing upon
the "unchangeability" of the old confession of faith and
constitution, and the legality of the action of the confer-
ences of 1885 and 1889, and the binding force and efficiency
of the revised confession of faith and amended constitu-
tion, among other things said : "There has been no sub-
stantial departure from the ancient beliefs of the church.
The revision was simply a clear and ample statement of
the great doctrines that are to be found in the creed of

1815, or that logically result from them. The 'general usages and distinctive principles of the church' are preserved. Identity in both polity and creed are undisturbed. We feel the more satisfaction with this conclusion since it is in harmony with that reached by the court of last resort, in matters of faith and discipline, within the church itself, viz., the general conference, and with conclusions reached by a clear majority of the membership. If the question was one of doctrine alone, we should feel inclined to treat the decision of a general conference as final, in accordance with a rule laid down in several cases, among which are *App* v. *Lutheran Congregation,* 6 Pa. 201; *German Reformed Church* v. *Seibert,* 3 id. 282 ; *McGinniss* v. *Watson et al.* 41 id. 9."

It may here be said that this principle has been recognized by this court in numerous cases. (See *Ferraria et al.* v. *Vasconcelles et al.* 23 Ill. 403, and 31 id. 25 ; *Chase et al.* v. *Cheney,* 58 id. 509.) In the latter case, quoting from *Baptist Church* v. *Witherell,* 3 Paige, 296, this court said : "Over the church, as such, the legal tribunals do not profess to have any jurisdiction whatever, except to protect the civil rights of others and preserve the public peace. All questions relating to the faith and practice of the church and its members belong to the church judicatories to which they have voluntarily subjected themselves." And it is clear from the holdings of this court in the cases cited, that upon questions of doctrine, practice and jurisdiction within the church the secular courts of this State have no authority to adjudicate. And this must be so, in order, on the one hand, to attain, preserve and perpetuate the highest possible enjoyment of enlightened civil and political liberty, and on the other, that christianity, as disseminated by means of the various church organizations, unfettered and unhampered by State law or State policy, may ultimately reach the highest standard in the moral development of the people. See *Schweiker et al.* v. *Husser,* 146 Ill. 399.

The opinion in the Pennsylvania case, *supra*, so clearly expresses the conclusion we have reached that we quote further, as follows : "Two of the questions raised * * * remain to be briefly considered. First, was the confession of faith absolutely unchangeable under the constitution of 1841; second, if not, was the change made in 1889 so made as to have a binding force upon the church. The appellants' argument upon the first of these questions rests on section 4 of article 2 of the constitution of 1841. It is as follows : 'No rule or ordinance shall at any time be passed to change or to do away the confession of faith as it now stands, nor to destroy the itinerant plan.' This provision is not to receive a technical interpretation, but is to be construed in the light which the whole instrument throws upon it, so as to advance the interest of the church and promote its objects. (*Monongahela Navigation Co.* v. *Coons*, 6 W. & S. 114; *Commonwealth* v. *Clark*, 7 id. 127; *Commonwealth* v. *Maxwell*, 27 Pa. 444; *Commonwealth* v. *Hartman*, 17 id. 119.) The purpose, in effect, of section 4, when so construed, is not to prohibit changes in the confession of faith that are in the interest of clearness of expression or fullness of statement of the accepted doctrine of the church, but to prevent changes in the doctrine to which the church is committed. The provision was not an impassable barrier thrown in the way of improvement of all sorts, but as a protection against the introduction of heretical doctrine destructive to the distinctive theological character of the church. It follows that the changes made in 1889 were not within the prohibition of this section, since they are shown to be changes in statement, in the interest of clearness and completeness, of declaration of belief in the doctrine actually held by the church, and which are found less fully stated in the confession prepared in 1815. * * * We come finally to inquire whether the proceedings of the conference and the commission, and the expression of assent and dissent by the society, are substantially in harmony with the pro-

vision of the constitution of 1841 that authorizes changes on the request of two-thirds of the whole society. The exact words of the provision are: 'There shall be no alteration of the foregoing constitution unless by the request of two-thirds of the whole society.' Alterations are not forbidden, but as the constitution is the fundamental law of the whole society, it is proper that it should be changed only by action or assent of the body affected by it. But there are two requirements to a lawful alteration: the action of the society, and the action of its highest church judiciary. The action of the first must be formulated and declared by the last. Which body—the popular one described as the society, or the ecclesiastical body called the general conference—shall originate the alteration is not prescribed. The proposition may therefore come from either. The bishops and clergy, who make up so largely the members of the conference, are, by reason of their constant attention to religious and theological subjects and the working of the machinery of the church, peculiarly qualified to lead the thought of the church on all subjects. It is not desirable, nor is it necessary under the provision we are considering, that they should sit with folded hands, waiting to be addressed by the society on any given subject of denominational or religious importance. They may, and it is clearly their duty to, direct attention to any given subject. They may urge its consideration and counsel speedy action, but they can not make the change that is needed. The society must move. The word employed is 'request,' but how or when, in the course of procedure, the request must be made is not stated. It may therefore be in any manner that expresses the desire of the society, and at any time before the final act of the conference. The only thing that can be positively affirmed as to its character is, that it must express the wish of the society. In the present case, action by the conference proceeded, and followed the expressed wish of the membership. That which pre-

ceded, suggested the desirability of certain changes, and reduced them to form for the examination and action of the society; that which followed, rested on the expressed wish of the society in regard to the proposed changes, and carried it into effect." And after showing the membership of the society and the number of votes cast for and against the proposed change, the court, in answer to the objection, also made here, that the 51,070 affirmative votes did not constitute two-thirds of the whole society, said: "In all elections the non-voting must be counted as willing to be bound by the action of the majority of those who vote. Any other rule would lead to interminable trouble and uncertainty. * * * In elections under the law of the States or the United States this has never been doubted." Such has been held to be the rule in this State. See *People* v. *Warfield*, 20 Ill. 160; *People* v. *Wiant*, 48 id. 263; *Melvin* v. *Lisenby*, 72 id. 63; *People* v. *Garner*, 47 id. 246.

In the latter case, in passing upon the objection made that the proposition for township organization had not been carried by a majority of the legal votes of the county, this court said: "It is a question of some difficulty to determine how it may be ascertained whether the majority of the voters of the county had cast their votes in favor of township organization. If we take the vote actually polled as being evidence of the number of the voters of the county, then the means are plain, and easy of application; but if any other mode be resorted to, there must result great inconvenience, uncertainty and delay." And it was, accordingly held that the vote cast must be taken as "*prima facie* evidence of not only the result of the election, but also of the number of legal voters in the county, and that this presumption will be acted upon until it is rebutted." Here no evidence is offered, except that the church membership was 207,800, to overcome the presumption that the 51,070 votes cast for, and the 3310 against, the revised confession consti-

tuted the entire membership entitled to vote upon the question. The mere fact, if it be conceded, that the membership was three times larger than the vote, is no criterion by which the court can ascertain the number entitled to vote. Even registry lists taken recently before an election have proven decidedly unreliable. Much more so would the church membership be, which fluctuates constantly, by reason of deaths, removals, additions, etc. To determine definitely the number actually entitled to vote would seem to be a practical impossibility. The same holding as in the *Garner case* has been made in very many other cases, among which see *County Seat of Linn County*, 15 Kan. 500; *State* v. *Sutterfield*, 51 Mo. 395; *Vance* v. *Austell*, 45 Ark. 407; *Carroll County* v. *Smith*, 111 U.S. 556; *Cass County* v. *Johnson*, 95 id. 369. In the last case cited it was said: "All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares. Any other rule would be productive of the greatest inconvenience, and ought not to be adopted unless the legislative will to that effect is clearly expressed."

The Pennsylvania court, after finding that the changes proposed were not for the purpose of introducing new or heretical doctrines, but were made in the interest of clearness and fullness of declaration of the actual belief of the church, say: "The 'whole society' was asked, in regular and proper manner, to express its preference or wish upon the adoption or rejection of the revision proposed, and ample time for consideration and decision was afforded them, and a suitable system provided for gathering up the result of the wishes and preferences to be expressed. A large majority of those who expressed any wish on the subject favored the revision. In conformity with the request or wish of the society, the general conference of 1889, by proclamation made by the bishops of the church, under its direction, declared the

fact that by the concurrent action of the society and the general conference the revised constitution and confession of faith had been adopted, and were to be accepted as a constitution and creed of the society. This general conference, and the churches adhering to it, are the church and society of the United Brethren in Christ, as fully, to all intents and purposes, as they were prior to 1889. Those who withdrew from the conference of 1889 and organized another conference, together with those who adhered to them, while they may be, in theological belief and religious observances, identical with the body from which they withdrew, are ecclesiastically distinct, as a result of their own acts, and they have no title to the property held by the society prior to 1889."

A careful examination of this voluminous record leads us fully to concur in the reasoning and conclusion of the foregoing opinion. All of the important questions presented for our consideration are thereby disposed of in accordance with our own views of the case. The question has also been passed upon by the Supreme Court of Oregon in a very able opinion by WOLVERTON, J., (*Philomath College* v. *Wyatt et al.* opinion filed Oct. 8, 1894,) and the same conclusion reached. Also to the same effect, see *Lamb et al.* v. *Cain et al.* 29 N. E. Rep. 13; *Brandage et al.* v. *Deardorf et al.* 55 Fed. Rep. 846.

This court, as we have seen, is committed to the doctrine that the decision of the church tribunal upon any matter of church policy, creed or discipline,—that is, matters purely ecclesiastical in character,—or as to its own jurisdiction, is conclusive upon the civil courts. (*Chase* v. *Cheney, supra.*) This being so, we may appropriately add what was said by the Supreme Court of Indiana in *Lamb* v. *Cain, supra:* "It will scarcely be denied that the general conference, which is the highest legislative and judicial body in the church, has power to determine what is the confession of faith of the church which it represents. The question of whether the old

confession of faith and the old constitution had been superseded by the new, was a question that squarely confronted the conference of 1889. Assuming that the election of the commission on revision, coupled with the action of the conference of 1885 and vote upon the subject of revision and amendment, gave it jurisdiction in the premises, the general conference of 1889 adjudged and declared that what appears in the record before us as the revised confession of faith and amended constitution was in fact the fundamental belief and constitution of the church of the United Brethren in Christ.   *   *   * Who shall question the correctness of its decision or review it? The civil courts? To do so would be to assume ecclesiastical jurisdiction—a jurisdiction they do not possess." It was accordingly held that the court had no power to review the decision of the general conference upon that subject. And we are of opinion that upon this latter ground alone the decision of this case might, with no little degree of propriety, be made to rest. In *Chase v. Cheney, supra*, this court said: "Freedom of religious profession and worship cannot be maintained if the civil courts trench upon the domain of the church, construe its canons and rules, dictate its discipline and regulate its trials.   *   *   * The civil power may contribute to the protection, but can not interfere to destroy or fritter away. The civil courts will interfere with churches or religious associations when rights of property or civil rights are involved, but they will not revise the decisions of such associations upon ecclesiastical matters merely to ascertain their jurisdiction." As said by NIBLACK, J., in the *White Lick Quaker case*, 89 Ind. 136: "The civil courts act upon the theory that the ecclesiastical courts are the best judges of merely ecclesiastical questions, and all matters which concern the doctrines and discipline of the respective denominations to which they belong." And this court has adhered to the same doctrine in all cases where the question has come before it. See cases *supra*.

Furthermore, the law is well settled and familiar that courts of equity will interpose only to prevent the perversion or abuse of a trust, especially if it be of a charitable or religious nature, by the trustees, or even a majority of the society, having possession of the property. In all such cases, however, "the trust and abuse of it must be clearly established, in accordance with the rules by which courts are governed in administering justice." (*Happy* v. *Morton*, 33 Ill. 398.) And in cases of this kind the alleged deviation from the tenets or true standard of faith of the religious denomination ought to be so palpable and unequivocal as to enable the court, from an examination of the historical and doctrinal practices of the church, to say, that in respect of the doctrine in question there has been an essential change and departure therefrom. (Ibid.; *Bowden* v. *McLeod*, 1 Edw. Ch. 588.) In other words, before the court will be justified in holding the trust to have been perverted or misused, it must clearly appear that such change or departure has taken place in the fundamental doctrine that it cannot be said to be the same, or that the denomination, as it existed before the change, is not, in all essential particulars and purposes, identical with that existing afterward. "There must be a real and substantial departure from the purposes of the trust,—such an one as amounts to a perversion of it,—to authorize the exercise of equitable jurisdiction in granting relief." *Happy* v. *Morton, supra.*

It therefore follows, that though there be a change in church polity or alteration in the expressed form of faith, if the substantive theological doctrine and the general polity be retained there is no such departure as would amount to a misuse or perversion of the trust. In this case, not only the denominational name, but the cardinal doctrines of faith and the general usages and distinctive principles of the church were preserved. The revised confession of faith expressed with greater clearness, exactness and perspicuity of statement the belief

of the church, while the amended constitution, retaining the general policy of the church, was more logical, more in keeping with the present age, more explicit and definite. No change whatever was made in the belief, teachings or practice of the church in anywise affecting its fundamental doctrine or policy. The substance was retained, and the form and manner of expressing it were altered and improved.

We are of opinion that in this case there has been no such perversion, misuse or abuse of the trust invested in appellees as would authorize interference by the courts. They and their predecessors have been in the possession and control thereof continuously for more than a fourth of a century, and have been and are the representatives, officers and members of the church of the United Brethren in Christ, and as such are entitled to retain the trust and the possession and enjoyment of the trust property. The court below so found, and dismissed appellants' bill for want of equity. After a laborious examination of this record we are not disposed to disturb the ruling. The decree will accordingly be affirmed.    *Decree affirmed.*