## BRUNDAGE et al. v. DEARDORF et al.

### (Circuit Court, N. D. Ohio, W. D. May 12, 1893.)

### No. 1,051.

1. EQUITY JURISDICTION—TITLE TO CHURCH PROPERTY—REMEDY AT LAW.
   Complainants, praying an injunction, alleged that they were duly elected trustees to hold certain church property, and that defendants, claiming the same property as trustees, were illegally and unlawfully elected such by a seceding faction of the church, and were holding such property in perversion of the lawful trust. *Held*, that a demurrer for want of equitable jurisdiction must be overruled, the remedy by injunction being peculiarly adapted, and that by ejectment inadequate, to the necessities of the case.

2. RELIGIOUS ASSOCIATIONS — SUPREME JUDICATORY — CONCLUSIVENESS OF DECISIONS.
   The decisions of the supreme judicatory of a religious denomination of the associated class, having a constitution and governed by local, district, state, and national bodies, are not conclusive upon the courts, when they are in open and avowed defiance, and in express violation, of the constitution of such body. Watson v. Jones, 13 Wall. 679, distinguished.

3. SAME—POWERS OF SUPREME JUDICATORY—CHANGE OF CONSTITUTION.
   Where the constitution of a church of the associated class provides that no amendment shall be made thereto except on request of two-thirds of the whole society, and that the confession of faith shall not be done away with or amended, a decision by the general conference of such society that such provisions are so far-reaching as to render them "extraordinary and impracticable," is nugatory and void. Watson v. Jones, 13 Wall. 679, distinguished.

**4. SAME—POWER TO APPOINT COMMITTEE TO PREPARE CHANGES.**

The general conference, being vested by the constitution with power to pass ordinances, had the right to appoint a commission to prepare a revised and amended constitution, and fix a time at which the vote of the church could be taken thereon.

**5. SAME—ELECTION—WANT OF NOTICE.**

The bill averred that defendants' title to the property in controversy rested upon amendments of the constitution made in pursuance of an enabling vote, for the taking of which no general day was fixed, no provision made for notice of the time and place of the election, and no such notice in fact given, in consequence of which less than one-fourth of the membership voted. *Held*, that under these averments the amendments in question were unauthorized and void, and defendants, holding thereunder, had no rights in the property in question.

In Equity. Bill by Homer H. Brundage and others against David Deardorf and others to determine adverse claims to church property, and for an injunction. Heard on demurrer to the bill. Demurrer overruled.

Young & Young and Doyle, Scott & Lewis, for complainants.

Gunckle & Rowe, J. A. McMahon, and Bowersox & Starr, for respondents.

TAFT, Circuit Judge. The complainants claim to be trustees lawfully elected by a quarterly conference of the Church of the United Brethren in Christ to hold the title to the property of said church, located in Hicksville township, in Defiance county, Ohio, for the use of the local unincorporated society known as the "Fairview Church." The complainants are all residents and citizens of Indiana. The defendants are residents and citizens of Ohio, in possession of Fairview church, and claim to be the lawfully-elected trustees thereof, except J. W. Lilly, who is acting as, and claims to be, the lawfully-elected pastor of the church.

The Church of the United Brethren in Christ belongs to what is known as the "Associated Class of Churches," and is governed, subject to the provisions and requirements of a constitution, by official boards, quarterly conferences, annual conferences, and a general conference, which are subordinate to each other, in ascending progression, in the order named. Under the constitution of the church, all right and title to its property in meetinghouses, real estate, etc., obtained by purchase or otherwise, for the use of the church, is recognized to be the property of the church; and under its rules the title to the property intended for the use of the members of the local society is required to be held by the trustees, not less than three in number, and by their successors in office. These trustees are elected by the quarterly conference to which the local society belongs, and hold their office during the pleasure of such quarterly conference. The Church of the United Brethren in Christ, down to the year 1889, numbered about 200,000 communicants, and had 3,000 local church societies. At that time a difference arose, resulting in schism, and the establishment of two general conferences. The schism extended down to the annual and quarterly conferences, and to the official boards,

so that the controversy has appeared in many of the local societies. The complainants belong to what is known as the "Conservative Party," and they claim to be the representatives of the true and original organization. The defendants, who are in possession of the church, are the trustees in subordination to that party in the general conference, where the schism occurred, which is known as the "Liberal Party" in the church.

This bill is filed to obtain a declaration from the court that the trustees appointed under Conservative auspices are, for the purposes of succession to property rights, the representatives of the true church, and that the defendants are the representatives of the seceding portion of the church, which no longer is entitled to claim the benefit of the original organization. The schism arose over the adoption of a new constitution and new confession of faith. The Conservative party maintains that the so-called adoption of the new constitution and confession of faith was, on the part of the members of the conference who carried it out, in bad faith, and in open and avowed violation of the constitutional limitations imposed on that general conference, and that thereby the members thus unlawfully acting seceded, and withdrew from the organization of the church, which is entitled to hold its property and use and enjoy the same; that by the continued possession of this usurping and seceding party the trust to which the property was originally devoted is perverted; and that the complainants, as representing the cestuis que trustent, may apply to a court of equity to prevent the continued perversion of the trust, and to restore the trust property to the uses to which it was originally devoted.

The land upon which stands Fairview church, which is the subject-matter of this controversy, and which is alleged to be of the value of more than $2,000, was conveyed in 1874, in consideration of $74, to Amo Furlow, John B. Johnson, and Benjamin F. Willits, trustees of the Church of the United Brethren in Christ. The bill avers that at the time the property was received by the said trustees the Church of the United Brethren in Christ, including the local society located at Hicksville, was identified and characterized among the evangelical denominations of the United States by its adherence to a fundamental constitution adopted in 1841, and to a confession of faith as it stood at the adoption of said constitution, and the members of said church, including those of the local society, were then expected to, and did, believe in the doctrines contained in said confession of faith. The averments of the bill are that the new constitution and the new confession of faith are in material respects departures from the old constitution and the old confession of faith, and that the use of property by an organization under the new constitution and the new confession of faith is a perversion of the trust to which it was originally devoted. The circumstances of the adoption of the new constitution and the new confession of faith are fully set out in the bill, and they will be considered later.

The first contention in support of the demurrer is that a court of equity has not jurisdiction to consider the bill, because its averments show that the complainants have a plain and adequate remedy at law, in ejectment. I do not think that this contention can be sustained. It is quite true that the complainants aver that they have a legal title to the property in controversy, but it appears from the bill that they hold it in trust for the use of the members of the local society whom they represent. It is also apparent that the controversy is with another set of trustees, who claim legal title for the purpose of maintaining the property for different uses under the same deed of trust. In other words, the question of title is to be determined by the character of the trust to which the property is to be devoted, and the action is to restrain the use of the property in perversion of the lawful trust. The property is, in a sense, brought into a court of equity, for the court to decide what use shall be made of it, and, by its equitable power of injunction, to enforce the proper use. The fact that in doing so it also has to determine the legal title will not oust the jurisdiction of a court of equity. The peculiar character of the possession by the church trustees, and of the use by the pastor and congregation, makes it clear that a mere action in ejectment would be quite inadequate as a remedy to secure the complainant trustees, and those whom they represent, the same peculiar possession and use for them. The writ of injunction is well adapted to prevent an unlawful intrusion in the pulpit by the pastor, and an unlawful use by the congregation, against all of whom it would be obviously impracticable to institute proceedings in ejectment. In the enforcement of a trust, where the circumstances are such that the remedy is not as complete at law as in equity, a trustee may appeal to a court of equity to assist him. See Harrison v. Rowan, 4 Wash. C. C. 202. There are, perhaps, other grounds upon which the jurisdiction here could rest, but the one stated is sufficient. Cases of this kind have frequently been considered by courts of equity, as in Watson v. Jones, 13 Wall. 679. It is true that the action there was by one of the cestuis que trustent, and not by one of the trustees, in whom was the legal title; but I think that the jurisdiction was asserted because of the character of the controversy, involving, as it did, the disposition and use of trust property. In Pennsylvania, in a number of cases, the inadequacy of a legal remedy, and the necessity for an equitable remedy, in cases of exactly this character, have been frequently recognized. See Kerr v. Trego, 47 Pa. St. 292; Ferraria v. Vasconcelles, 23 Ill. 456; Gibson v. Armstrong, 7 B. Mon. 481; Trustees v. Hoessli, 13 Wis. 348.

We now come to the merits of the controversy, as stated in the bill. The constitution of 1841, then adopted by a general conference of the society, and which remained in force at least until 1889, is as follows:

"We, the members of the Church of the United Brethren in Christ, in the name of God, do, for the perfection of the saints, for the work of the min-

istry, for the edifying of the body of Christ, as well as to produce and secure a uniform mode of action in faith and practice, also to define the powers and business of a quarterly, annual, and general conferences, as recognized by this church, ordain the following articles of constitution:

"Article 1. Section 1. All ecclesiastical power herein granted, to make or repeal any rule of discipline, is vested in a general conference, which shall consist of elders elected by the members in every conference district throughout the society: provided, however, such elders have stood in that capacity three years in the conference district to which they belong. Sec. 2. General conference is to be held every four years; the bishops to be considered members and presiding officers. Sec. 3. Each annual conference shall place before the society names of the elders eligible for membership in the general conference.

"Article 2. Section 1. The general conference shall define the boundaries of the annual conferences. Sec. 2. The general conference shall at every session elect bishops from among the elders throughout the church, who have stood six years in that capacity. Sec. 3. The business of each annual conference shall be done strictly according to discipline; and any annual conference acting contrary thereto shall, by impeachment, be tried by the general conference. Sec. 4. No rule or ordinance shall at any time be passed to change or do away the confession of faith, as it now stands, or to destroy the itinerant plan. Sec. 5. There shall be no rule adopted that will infringe upon the rights of any, as relates to the mode of baptism, the sacrament of the Lord's supper, or the washing of the feet. Sec. 6. There shall be no rule made that will deprive local preachers of their vote in the annual conference to which they severally belong. Sec. 7. There shall be no connection with secret combinations, nor shall involuntary servitude be tolerated in any way. Sec. 8. The right of appeal shall be inviolate.

"Article 3. The right, title, interest, and claim of all property, whether consisting in lots of ground, meetinghouses, legacies, or donation of any kind, obtained by purchase or otherwise, by any person or persons, for the use, benefit, or behoof of the Church of the United Brethren in Christ, is hereby fully recognized and held to be the property of the church aforesaid.

"Article 4. There shall be no alteration of the foregoing constitution, unless by the request of two-thirds of the whole society."

The bill avers that some time previous to the year 1885 a faction arose in the Church of the United Brethren in Christ, hostile to the lifelong principles of the church, on the subject of secret combinations, and to the requirements of its constitutional provisions relating thereto, and that they carried their opposition to such an extent as to openly recommend and advocate, in order to accomplish their purposes, a violation and nullification of said fundamental constitution, and of the provisions contained therein, and that, conspiring and combining together to accomplish this end, they called and held conventions, and passed resolutions declaring their intention to disregard and nullify the constitution and the laws of the church forbidding secret combinations, and, in violation thereof, to receive as members of said church persons connected with such combinations, and recommending the same course and policy to others; that subsequently this faction secured control of the general conference which met at Fostoria, Ohio, in the year 1885; that for the purpose of accomplishing and carrying out the unlawful purpose aforesaid a question was raised by them as to the binding force and validity of the constitution, which had always theretofore, and ever since its adoption, in 1841, been acquiesced in by the entire membership of said church as the fundamental organic law of the church,

unchangeable except in the mode therein provided; that at this conference the subject of secret combinations, together with the constitution and confession of faith, were referred to a committee known as "Committee No. 6," which made a report conceding the validity of the constitution, and admitting the amendment article, and the article forbidding the change in the confession of faith, to have the meaning and effect arising from the natural scope and import of their language, but that, for the purpose of accomplishing their unlawful ends, and with a view to carrying out the conspiracy above stated, the committee, and the faction in control of the conference, characterized these articles as so far-reaching as to render them extraordinary and impracticable as articles of constitutional law, and that for these reasons the conference had a right to devise and plan for a new form of belief, and amended fundamental rules for the government of the church, whenever it was believed that a majority of the people favored a change thereof,—thereby expressly declaring that in the plan devised and adopted by them for this purpose it was not intended to conform, in good faith, to any construction of said constitutional provision, but, on the other hand, to nullify and override the same, and to openly set the same at defiance, and to effect a change therein by methods of their own devising, not claimed to conform to the requirements of the constitution, but avowedly unconstitutional and revolutionary in their character; that pursuant to this declared intention the conference proceeded to take measures for the amendment of the constitution, and for the adopting of a new form of belief, by a plan of their own devising, which was not put forth as conforming to the provisions of the said constitution, or to any construction placed thereon by said conference, and having no other foundation or authority than that which the conference claimed as resulting from the extraordinary and far-reaching character of the constitutional articles on these subjects, which provisions it thereby disregarded and nullified; that thereupon a church commission was appointed by the conference to prepare a form of belief, and amended fundamental rules for the government of the church, for a submission of these to a vote of the church membership according to a plan to be adopted by the commission, with a provision that, if a result of the vote showed that two-thirds of the vote cast approved the proposed confession of faith and constitution, it would be the duty of the bishops to publish and declare the result in the official papers of the church, and that when so proclaimed they should become the fundamental belief and organic law of the church; that at the time of the passage of this resolution, in 1885, a number of the members of the conference—in all, 34—presented a protest against said election as being illegal, and such protest was placed on the journal of the conference; that the commission met in Dayton in 1885, and prepared a revised confession of faith, and amended constitution, which were in November, 1888, submitted to the membership of the church, in accordance with a plan devised and adopted by said commission; that no general

day was fixed for the taking of said vote, and that no provision was made for giving notice to all the members of said church of the particular day and place of election, and that no general notice was in fact given; that at the time of taking said vote the church contained 204,000 members, but that only 41,070—less than one-fourth of the membership—voted in favor of such changes; that in May, 1889, before the general conference of that year, five of the six bishops of the church issued a proclamation in the official church papers declaring the result of the vote, and stating that two-thirds of the vote cast had been cast in favor of the new instruments; that at the meeting of the general conference in 1889 at York, Pa., a member of the church commission appointed by the conference of 1885 reported the proceedings of that commission, although the commission itself had not been directed to make such a report, and had not in fact directed the reporting member to do so; that it was not understood by any persons called upon to vote for the adoption of the new constitution and confession of faith that such vote was to be used as a request for an amendment of the constitution to be presented to the conference of 1889, and yet the reporting member used it as such, and the conference treated it as such, approved the acts of the commission, and directed the new constitution and new confession of faith to be proclaimed as the organic law and faith of the church, and passed a resolution that thenceforth they were acting under the amended forms thus adopted.

The charge is that all these acts were in bad faith towards those still adhering to the old constitution and confession of faith, and with the intention of overriding the original compact upon which the society was organized and conducted for 40 years; that the new constitution is materially different from the old one, in that it provides for a lay delegation in the general conference, makes possible future alterations in the confession of faith, and lays down a different rule on the subject of secret combinations, and a wholly different amendment, so that it embodies a different form of church government from that existing under the constitution of 1841; that there have been material changes, omissions, and additions to the confession of faith; that the defendants, claiming to be the trustees of the Liberal party, have excluded, and still do exclude, the complainants from the management and control of the church edifice, and have prevented, and still prevent, those adhering to the constitution of 1841, and said confession of faith of 1815, and who still continue to be members of said true Church of the United Brethren in Christ, from assembling and worshipping therein. It is further averred that when the proclamation at the conference at York was made, that they had passed from under the old constitution, and would legislate under the new, delegates to said general conference to the number of 15, together with others, lawfully admitted as alternates, refused to recognize the constitutionality of the proceedings, and the methods by which it had been attempted to put the same in force, and under the chairmanship of Bishop Wright, a regular bishop of said

church, continued and completed the regular session of the quadrennial general conference under the old and lawful constitution, and since that time have continued and do still maintain the church organization of the true church, have organized and held regular conferences, annual and quarterly, throughout the territory covered by said religious organization,—among others, the quarterly conference at which complainants were appointed trustees as aforesaid, in the manner required by the constitution of 1841, and the laws, rules, customs, and usages of said church thereunder.

The question raised by the demurrer is whether the facts recited show that the 15 members of the general conference, and the 15 alternates with them, who have refused to recognize the adoption of the new constitution and new confession of faith, and the annual and quarterly conferences which have since organized in subordination to them as a general conference, are the organization of the true Church of the United Brethren in Christ, and whether, by the course which the majority of the general conference of 1889 took in pursuance of the conspiracy charged as begun in the conference of 1885, they thereby ceased to be the general conference of the true church, and became seceders, and withdrew from the organization entitled to control and use the property devoted to the Church of the United Brethren in Christ.

The question is one of identity, and that identity is to be determined by a reference to the fundamental law of the church, which was the original contract or compact under which its organization was effected, and in pursuance of which, and subject to which, all the property acquired for its use became vested in the church. An open, flagrant, avowed violation of that original compact, by any persons theretofore members of the church, was necessarily a withdrawal from the lawful organization of the church, and the forfeiture of any rights to continued membership therein, and to the control and enjoyment of the property conferred on such organization. The chief contention by counsel on behalf of the defendants is that the supreme court of the United States, in the case of Watson v. Jones, supra, decided that in this class of churches known as the "Associated Class," governed by local, district, state, and national conferences, vested with legislative powers, the decision of the ultimate body, known in ecclesiastical language as the "Supreme Judicatory," is conclusive upon matters of ecclesiastical law, the rules, customs, and discipline of the church, and that its action cannot be inquired into by the civil courts, but must be taken as final by the civil courts, in determining property rights dependent thereon. The question in Watson v. Jones was whether the action of the general assembly of the Presbyterian Church was final, in exscinding from its organization the synod of Kentucky, and the local presbytery of Louisville, on the ground that those bodies were disloyal to the government of the United States, and asserted the doctrine of the divine character of the institution of slavery. The action of the general assembly was disciplinary, but

in its action was involved the decision that it had jurisdiction to determine that disloyalty, and belief in slavery, were of such a character as to be offenses against the moral law of the church. The supreme court (Mr. Justice Miller delivering the opinion) held that the decision of the general assembly that it had jurisdiction was as conclusive as its decision, if within its jurisdiction, upon the merits was conceded to be; and that the court could not interfere, even in a case involving property rights, with the succession to, or change in the control of, property, which the decision of the assembly made necessary.

I do not think that the case of Watson v. Jones controls the case presented in this bill. In Watson v. Jones the question was one of discipline. The general assembly which acted was admitted to be the supreme judicatory of the church, and there was no other general assembly disputing its power to act as such. In the present case, while the conference which met in 1889, at the time of meeting, was the acknowledged conference of the church, there was a division between the members when the new constitution was said to have been adopted, and two general conferences were then established. The question now to be decided is which of those two general conferences is entitled to be recognized, under the averments of the bill, as the proper governing body of the church. Schweiker v. Husser, decided by the supreme court of Illinois, March 31, 1893.[1]

More than this, the averments of the bill here charge a conspiracy on the part of a majority of the members who met in conference to override and disregard the original compact. The charge is that this was the avowed intention of the conspiring faction, and this charge is supported by the report of the committee No. 6, adopted in the conference of 1885, in which it is stated that the provision of the old constitution of 1841, that no amendment can be made to the constitution except on request of two-thirds of the whole society, and the provision that the confession of faith shall not be done away with or amended, as it now stands, were so far-reaching as to render them extraordinary and impracticable as articles of constitutional law. Even if the supreme judicatory has the right to construe the limitations of its own power, and the civil courts may not interfere with such a construction, and must take it as conclusive, we do not understand the supreme court, in Watson v. Jones, to hold that an open and avowed defiance of the original compact, and an express violation of it, will be taken as a decision of the supreme judicatory which is binding on the civil courts. Certainly, the effect of Watson v. Jones cannot be extended beyond the principle that a bona fide decision of the fundamental law of the church must be recognized as conclusive by civil courts. Clearly, it was not the intention of the court to recognize as legitimate the revolutionary action of a majority of a supreme judicatory, in fraud of the rights of a minority seeking to maintain the

[1]Opinion held pending rehearing.

integrity of the original compact. This is the case stated by the bill, as I understand it, and such a case the language of Mr. Justice Miller in Watson v. Jones does not cover. No other case than Watson v. Jones need be considered, because in no case has the doctrine of the conclusive effect of the judgment of the supreme judicatory of the church been so strongly stated. If that does not control this case, no other authority brought to my attention does.

The next question is whether the acts of the majority in the conference of 1885 and in the conference of 1889 were violations of the original compact or constitution of 1841. As averred in the bill, I am clear that they were. The constitution, in terms, is a limitation upon the powers and business of the quarterly, annual, and general conferences. By the first article, all ecclesiastical power there granted to make or repeal any rule of discipline is vested in the general conference, as therein constituted. It is given power to define the boundaries of the annual conferences. It is given power to elect bishops. Section 4 of article 2 is: "No rule or ordinance shall at any time be passed to change or do away the confession of faith, as it now stands, or to destroy the itinerant plan." This section is necessarily a limitation upon the power of general conferences, because it alone is vested with power to pass rules and ordinances. Section 5 is a further restriction as to the rules to be adopted. Section 6 is a similar restriction. Section 7 is a limitation upon the membership of the body. Section 8 is a limitation upon the general conference and annual conferences, forbidding them to deny the right of appeal. Article 4 is a limitation both upon the general conference, and upon the right of the majority of the members to change the original compact. Though it is not expressly stated, the only meaning that can be given to the constitution is that the amendment of the constitution is to be made by the general conference. And this power is limited by requiring the request or approval of two-thirds of the entire society to give the amendment validity. I do not attach any particular importance to the word "request," as indicating that it is a condition precedent to the action of the general conference. It would seem that all that was intended was that no amendment of the constitution should go into effect until two-thirds of the whole society should agree thereto. The constitution is inartificially drawn, and the expression "request" should not have a narrow meaning. Nor do I think there is anything in the article or in the constitution which prevents the general conference from lawfully taking steps looking to the amendment of the constitution in accordance with its terms. It would seem to be a legitimate exercise of the supreme legislative power of the general conference to enact an ordinance that upon a certain day the 'expression of the society should be taken by vote upon the question whether the constitution should be amended in a certain way. While the constitution was adopted at a time when the church was smaller than it is now, the hope of the founders, doubtless, was that it would extend the country over.

It is not to be presumed that they inserted in the constitution a provision which, while it professed to give the power of amendment, imposed such limitations as to make it practicably impossible. Therefore, I am of the opinion that the general conference of 1885 had the right to appoint a commission to prepare a revised and amended constitution, and fix a time at which the vote of the church should be taken to signify the desire of the church that the amended constitution should be adopted. It may be conceded, though it is not decided, that it was also within the legitimate powers of the general conference to provide that, if two-thirds of those voting at the time upon the amendment should be in favor of the new constitution, it should be held to be two-thirds of the entire society, on the ground that, if notice was given to the entire society of such a rule, then a failure to vote would be an acquiescence in the vote of those who did vote. But, to make such a provision lawful, full and ample notice of this requirement, and of the day of the election, should be given to each member of the church. The averment of the bill is that no such notice was provided for, or given to the members of the church. If so, then the election was a mere nullity. An election not fully and lawfully proclaimed has no force or validity. A fortiori, it has no force when, in order to make the result lawful, those who do not vote must be counted as acquiescing in the vote of those who do.

Without, therefore, considering any of the other questions raised, it is sufficient to say that the vote of 50,000 in a membership of 200,000, without notice full and ample to the entire membership of the entire church, could not constitute a request of two-thirds of the whole society, within the meaning of the constitution, and would render the adoption of the new and amended constitution wholly invalid. As the new and amended constitution changed materially the form of the church government, those who, in defiance of their plain obligation, refused to abide by the original compact, and asserted the continuance of their body under the new constitution, must be held to have withdrawn from the organization of the true church, and to have lost their right of membership therein. It follows that the majority of the conference of 1889 has ceased to be and represent the true church, and that those who adhere to the old constitution, among whom are the complainants, remain the only representatives of the Church of the United Brethren in Christ, which this court can recognize as entitled to assert its property rights.

For this reason the demurrer to the bill will be overruled. It should be distinctly understood that this ruling is upon the averments of the bill, exactly as they are. The opinions which have been cited from Oregon, Indiana, and local courts in Pennsylvania, Ohio, and other states, were not upon demurrers to the bills, but were upon issues of fact raised upon bill and answer; and the questions therein presented are, or may be, quite different from those here considered.