BRUNDAGE et al. v. DEARDORF et al.

(Circuit Court of Appeals, Sixth Circuit. March 7, 1899.)

No. 596.

1. EQUITY JURISDICTION—CHURCH PROPERTY—TITLE—REMEDY AT LAW.

Where trustees holding church property are claimed to have been illegally elected by a withdrawing faction of the church, and to be holding such property in perversion of the trust, equity has jurisdiction of a suit by trustees alleged to be the legal representatives of the church, to enjoin them from exercising further authority over the property; the remedy by injunction being peculiarily adapted, and that by ejectment inadequate.

2. TRUSTS—RELIGIOUS SOCIETIES.

While equity will not permit a perversion of trust property given to a church for the support of some particular creed or dogma so long as there are agencies within the dedication to carry out uses intended, yet where property is conveyed to a church by a sale for a valuable consideration, there is no trust for a specific form of worship to enforce, and the fact that the church subsequently changed its creed, etc., is immaterial.

3. RELIGIOUS ASSOCIATIONS—SUPREME JUDICATORY—POWERS—CONSTITUTION—AMENDMENT.

Where the constitution of a church of the associated class provided that it should not be amended except on request of two-thirds of the whole society, and that the confession of faith should not be abrogated or amended, a general conference of the society, which had adopted the constitution and confession, composed of representatives from the various churches, and constituting the supreme judicatory thereof, was authorized to determine that such constitution and confession were inadequate, and provide means for their amendment, and the submission thereof to the vote of the members of the society.

4. SAME—CONCLUSIVENESS OF DECISIONS—REVIEW IN CIVIL COURTS.

The decisions of the supreme judicatory of a religious society of the associated class having a constitution, and governed by local, state, and national bodies, of all questions of ecclesiastical cognizance, are binding and conclusive on the members, and cannot be reviewed in the civil courts.

5. SAME—DISSENTING MEMBERS—RIGHT TO CHURCH PROPERTY.

The general conference of a religious society decided that its constitution and creed, which the conference had previously adopted, and which provided that it should not be amended except on request of two-thirds of its members, etc., was inadequate, and adopted measures for its amendment. The amendments were submitted to a vote of the members, after due notice, and more than two-thirds of those voting voted in favor of the amendments, whereupon the general conference decided that they had been adopted. A portion of the dissenting members then withdrew, and claimed the property purchased by the church, on the ground that those favoring the amendments had departed from the principles and purposes of the church. *Held*, that the amendment to the constitution and creed were matters of ecclesiastical cognizance within the jurisdiction of the conference, that the society was bound by its decisions, and that the withdrawing members were not entitled to such property.

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

George R. Young, for appellants.

John B. McMahon and Lewis B. Gunckle, for appellees.

Before LURTON, Circuit Judge, and SEVERENS and CLARK, District Judges.

LURTON, Circuit Judge.   This suit involves the use and control of a certain church property known as "Fairview Church," situated in Defiance county, Ohio.   This property was originally conveyed, in 1874, to three persons, and "their successors in office," as trustees for the use of the Church of the United Brethren in Christ.   The appellants, complainants below, claim to be trustees in succession to those named in the deed, and have been duly elected to their office by an annual conference having jurisdiction over the territory within which Fairview Church is situated, which is in fellowship with one of two distinct ecclesiastical divisions into which the original United Church of the United Brethren in Christ is now divided, each of such divisions claiming to be the true and only original church described in the deed.   The contention of the complainants was and is that they hold the legal title to said Fairview Church in trust for the use of a local congregation which is in fellowship and association with the annual and general conferences under whose authority complainants hold office.   Prior to May 13, 1889, the Church of the United Brethren in Christ was a united, single, ecclesiastical organization, governed by a system of judicatories consisting of an official board having authority in and over a particular congregation, quarterly and annual conferences having jurisdiction over the churches within a particular territory, and a general conference, composed of representatives elected by the annual conferences, which had jurisdiction over all.   A division occurred in the general conference of 1889, and a small minority withdrew from the place in which the conference was in session, and organized themselves into a general conference, and claimed to be the true and only organization having valid succession and authority as the general conference of the church.   This division extended into many of the annual conferences and congregations. Those thus withdrawing were in large part a party which, in the United Church, had been known as "Radicals"; those remaining were called "Liberals"; and for the purpose of distinguishing these distinct ecclesiastical organizations, each calling themselves the Church of the United Brethren in Christ, we shall call that branch of the church to which complainants belong "Radicals," and the branch to which defendants are attached "Liberals."   The defendants, now appellees, are the pastor in charge of Fairview Church and three trustees, all of whom hold office by due appointment under the annual and general conferences to which the Liberals adhere.   The complainants are all citizens of the state of Indiana, and the defendants are all citizens of the state of Ohio, and federal jurisdiction results from this diversity of citizenship.

Complainants claim that they, and they only, are entitled to the exclusive control of said church property, and to cause it to be applied to the ecclesiastical uses and purposes to which it should be devoted as a church edifice for the use of a congregation subordinate to that division of the church under which they hold office.   They pray the aid of a court of equity in preventing what they call a diversion of the property from the trusts to which it is properly devoted, and ask the injunctive process of the court to prevent the appellee who claims to be the pastor in charge from officiating therein as pastor,

and to prevent the other defendants from usurping the office and functions of trustees of said church, and from interfering or intermeddling with complainants in their official duties as the only legal trustees of said property. They claim that the remedy at law by action of ejectment is inadequate, inasmuch as they, as well as the defendants, are but trustees holding for the use of beneficiaries, whose rights can only be adequately declared and enforced through the equitable remedy of injunction. A demurrer going to the jurisdiction in equity was filed by the defendants, and, after full argument, was overruled by Taft, Circuit Judge, whose opinion is reported in 55 Fed. 839. The case made is one in which trustees may rightfully apply to a court of equity for aid and assistance. The mere fact that the legal title must be determined is not enough to defeat equitable jurisdiction. Two sets of trustees, each claiming to be the exclusive legal trustees, are contending over the use and possession of property claimed under the same deed. The title depends upon the character of the trust. When that is declared, it is the peculiar province of a court of equity to prevent a diversion of the property from its lawful and proper use. The remedy by injunction to prevent a perversion of property devoted to ecclesiastical uses is peculiarly adapted to meet the necessities of the case, for trustees, whether in sympathy with the trust or adverse thereto, will be controlled and compelled to devote the property to the uses to which it was intended through the coercive power of the writ of injunction. The remedy at law, upon the facts of the case, is not adequate, and the demurrer was properly overruled.

The question at issue involves the identity of the church which is the declared beneficiary under the deed with that represented by one or the other of the contending divisions into which that church was divided in 1889. The cause of that division was the adoption and promulgation of a new constitution and confession of faith by the general conference which assembled in that year at York, in Pennsylvania. The complainants say that they, and those whom they represent, adhere to the old constitution and the old confession of faith, and thus are able to present an infallible standard by which their identity with the church as it existed at the date of the deed may be determined. They say, also, that the defendants, and that organization for which they stand, have adopted a new and fundamentally different constitution and confession of faith by revolutionary methods, and have, therefore, no rightful claim to be organically the successor of the church formerly united under the old constitution and confession of faith. Upon these premises they contend that, where property is conveyed for the uses of a congregation as a place of worship, a trust is created which will be enforced for the purpose of maintaining that form of religious worship and profession of faith to which the property was originally devoted, and that such a trust will be enforced in favor of that part of the society adhering to and maintaining the original principles upon which it was founded, without regard to whether it be a minority of the particular congregation or a minority of the larger body, of which the congregation is but a subordinate member. It may be conceded that, if property is dedicated by will or deed of the donor for the express purpose of being held and ex-

clusively used for the teaching, support, or maintenance of some specific dogma, or creed, or form of religion, and that purpose is declared by the instrument under which the property is held, a trust arises, and that a court of equity will prevent a perversion of the trust attached to its use. So long as there are persons or agencies within the meaning of the original dedication, and willing to carry out the uses intended to be maintained by the donor, a court of equity, upon their application, will extend its aid in executing the trust. But the deed under which Fairview Church is held is one of bargain and sale; the Church of the United Brethren in Christ being the vendee for a valuable consideration, paid by it. We have, therefore, no inquiry to make as to the purpose and intent of the donor, and no trust for a specific form of religious worship to enforce. The case resolves itself into an inquiry as to which of the two organizations claiming to be the organic successor of the church as it existed at the date of this deed is in fact and law entitled to be regarded as the Church of the United Brethren in Christ.

The voluntary religious society called the "Church of the United Brethren in Christ" was organized in the year 1800, or about that time. No creed or formal confession of faith was adopted until 1815, when the general conference of that year adopted and promulgated the instrument herein called the "Old Confession of Faith." No fundamental framework or organic church law was adopted until 1841, when the general conference of that year adopted an instrument for the government of the church, being the body of organic law herein called the "Old Constitution." That constitution was never submitted to the members of the society for their adoption or approval, and was the act of the general conference alone; a body then composed of a small number of clergymen, representatives of the annual conferences by whom they had been elected. There was at all times more or less question as to the binding obligation of this constitution, though it was generally acquiesced in and adhered to as the organic law of the organization. The organization thus perfected constituted one of that class of ecclesiastical organizations in which the congregations are not independent of other ecclesiastical associations, but were associated as subordinate members of a general and wider organization, and having a system of government in regular succession, consisting of the official board over the congregation, the quarterly and annual conferences over a group of congregations, and a general conference with general power and control over all the churches and membership. The constitution adopted in 1841 in an inartificial way defined the powers of these several judicatories, and limited the otherwise apparently supreme authority of the general conference in certain important particulars. The limitations of chief importance imposed by that constitution upon the general conference are found in article 4, which is as follows: "There shall be no alteration of the foregoing constitution unless by request of two-thirds of the whole society," and in article 2, § 4, which is in these words: "No rule or ordinance shall at any time be passed to change or do away with the confession of faith as it now stands, nor to destroy the itinerant plan." Complainants say that the constitution has not been

altered in the only way in which it could be constitutionally done, and that the confession of faith has been changed in essential particulars, in defiance of the constitutional prohibition. It cannot be successfully denied that, if the constitutional provision in respect to a change of the confession of faith was itself changed, a change in the confession, made in pursuance of the altered constitution, would not be a violation of the organic law of the society. Both the constitution and the confession of faith were, in fact, changed by an exercise of the same power at the same time and way, and must, therefore, stand or fall together. How were these changes brought about? The general conferences of the church were held every four years from 1841 up to and including 1889. These conferences were composed of the bishops of the church and elders from each annual conference district. In 1885 a regular general conference of the church was held at Fostoria, Ohio, whose members were regularly chosen according to the law and usages of the church. At that conference, and on the second day, a committee upon revision was appointed, consisting of 13 members, to whom was referred the confession of faith, the constitution, and section 3 of chapter 10 of the discipline, whereby members of secret societies were excluded from membership. At a later day that committee made the following report:

"To the General Conference: Your committee to which was referred the confession of faith, constitution, and section 3 of chapter 10 of the discipline, beg leave to report that we have given these subjects much and most prayerful attention, and now submit the result of our deliberations:

"First. We find that the present constitution of the church was never submitted to the suffrage of the members and ministry of the church for ratification, either by popular vote or by conventional approval, though it purports to be the constitution of the 'members' of the denomination.

"Second. We find, by reference to the records, that throughout most of its history it has been the subject of question and differences of opinion as to its legality and binding force as an organic law.

"Third. We find, also, that the clause found in article 2, § 4, which says, 'No rule or ordinance shall at any time be passed to change or do away with the confession of faith as it now stands,' and article 4, which says, 'There shall be no alteration of the foregoing constitution unless by request of two-thirds of the whole society,' are, in their language and apparent meaning, so far-reaching as to render them extraordinary and impracticable as articles of constitutional law.

"Fourth. From the facts and reasons thus indicated, we conclude that the constitution has acquired its force only by the partial and silent assent of the church, and that the general conference has a right to institute measures, looking to the amendment, modification, or change of the constitution at any time when it is believed that a majority of our people favor a modification thereof.

"Fifth. It is the sense and belief of your committee that the constitution, as it stands, is not in harmony with the present wishes of our people, as has been indicated in discussions, petitions, and elections during the past year.

"Sixth. For these reasons, and for the purpose of finally settling all questions of dispute and matters of disturbance to the peace and harmony of the church, so far as the confession of faith and constitution are concerned, your committee would recommend the adoption of the following paper, namely:

" 'Church Commission.

" 'Whereas, our confession of faith is silent or ambiguous upon some of the cardinal doctrines of the Bible as held and believed by our church; and whereas, it is desirable and needful to so amend and improve our present.

constitution as to adapt its provisions more fully to the wants and conditions of the church in this and future time: Therefore,

" 'Resolved, by the delegates of the annual conferences of the church of the United Brethren in Christ in general conference assembled, that a church commission composed of twenty-seven persons, and consisting of the bishops of the church, and ministers and laymen appointed and elected by this body, an equal number from each bishop's district,—provided, that the Pacific district shall have two members besides its bishop,—be, and is hereby, authorized and established.

" 'The duties and powers of this commission shall be to consider our present confession of faith and constitution, and prepare such a form of belief, and such amended fundamental rules for the government of this church in the future, as will, in their judgment, be best adapted to secure its growth and efficiency in the work of evangelizing the world.

" 'Provided (1) that this commission shall preserve, unchanged in substance, the present confession of faith so far as it is clear; (2) that it shall also retain the present itinerant plan; (3) it shall keep sacred the general usages and distinctive principles of the church on all great moral reforms as sustained by the Word of God, in so far as the province of their work may touch them.

" 'Provided, further, that in the final adoption, as a whole, of a confession of faith and constitution for submission to the church by the commission, a majority vote of all the members composing the commission shall be necessary.

" 'Resolved, that this commission shall meet at such time and place as the board of bishops may appoint, and is expected to complete its work by January 1, 1886.

" 'The commission shall also adopt, and cause to be executed, a plan by which the proposed confession of faith and constitution may receive the largest possible attention and expression of approval or disapproval by our people, including all necessary regulations for taking, counting, and reporting the vote.

" 'Resolved, that when, according to the foregoing provisions, the result of the vote of the church shows that two-thirds of all the votes cast have been given in approval of the proposed confession of faith and constitution, it shall be the duty of the bishops to publish and proclaim said result through the official organs of the church; whereupon the confession of faith and constitution thus ratified and adopted shall become the fundamental belief and organic law of this church.

" 'Provided, further, that the adoption of the constitution, as aforesaid, shall in no wise affect any legislation of this general conference for the coming quadrennium.

" 'Resolved, that in case of any vacancy in the commission by death, resignation, or otherwise, the commission shall fill such vacancy.

" 'The necessary expenses of this commission shall be paid out of the funds of the printing establishment.' "

The same committee made, also, a supplementary report touching membership in secret societies. These reports and recommendations were signed and indorsed by eleven members of the committee. A minority report, signed by the remaining two members, was presented, which was in these words:

"We, your committee on constitution, confession of faith, and section 3 of chapter 10, would report as follows: We have deliberately considered the important interests committed to us, and have concluded as follows:

"(1) The constitution we now have in the discipline, and have had for forty-four years, is the constitution of the Church of the United Brethren in Christ, and every member legally received into the church for years has consented to be governed by the same. It was declared legal also by the general conference of 1849, and to it our legislation has conformed, and under its direction our officers have been elected, and the general conference formed according to its provisions.

"(2) This constitution makes no provision for the general conference to alter or change it without first securing the consent of the members of the church by a two-thirds vote, as required in article 4 of the constitution; and to take any other method would not be legal:

"(3) It is our view that this question as to the constitution should be determined before we revise section 3 of chapter 10."

The majority report was adopted by the conference and the members of the commission chosen in accordance therewith. Within the time prescribed, this commission reported to the church the revised confession of faith and the amended constitution, with a plan for the submission thereof to the entire membership of the church. This plan provided that a vote should be taken in all the congregations during the month of November, 1888; that the publishing agent of the church should furnish, three months before the time of voting, a sufficient number of tickets and blanks for the return of the result to the presiding elder of each district, who should distribute same to the different pastors within his jurisdiction, and that the pastors should distribute same among their members. The plan provided that the confession should be submitted to a distinct vote as an entire instrument, the ballots for that purpose having written or printed thereon the words, "Confession of Faith—Yes or No;" and that the constitution should also be submitted to a separate vote as an entirety, with certain exceptions, in regard to which provision was made for a distinct expression of opinion. Provision was also made that the pastor, elders, and stewards of each society should constitute a local board of tellers, who should prescribe the particular day in November when the vote of the congregation in which they held office should be taken, enroll the voters, allowing sick, absent, and aged members to vote by signing a ballot, and sending it to such local board of tellers. The returns of such election were required to be sent to a board of tellers, to be selected by the annual conference, who were required to count and report the result to a general board of tellers named in the plan, who, in turn, were required to tabulate and report the vote of all the conferences to the board of bishops. The board of bishops were then required to prepare a letter addressed to the conference on the work of the commission. The time adopted for the taking of the vote coincided with the time for electing delegates for the general conference of 1889. This plan was submitted, accompanied by a temperate, conservative, and pious address from the bishops of the church, urging upon the people a calm and earnest consideration and a free vote upon the matters thus submitted. This plan and address were submitted in January, 1886, thus securing a period of nearly three years within which a full consideration of the proposed changes might be had. The record abundantly shows that during this period the question of the adoption or rejection of these revisions was widely discussed and debated, and no one can doubt that every member of the society had his attention directed to these matters, and had every opportunity afforded of enlightening himself and expressing his opinion through the election which followed. During the month of November, 1888, the vote was taken in accordance with the plan submitted, and this vote was counted and canvassed by the several boards of tellers provided,

and was declared by the general board on January 15, 1889, and the result published through the newspaper organs of the church. The result was as follows:

For the confession of faith............................................ 51,070
Against the confession............................................... 3,310
For the amended constitution............................................ 50,685
Against the constitution............................................. 3,659
For lay representation............................................... 48,825
Against lay representation.......................................... 5,634
For section on secret societies....................................... 46,994
Against same........................................................ 7,229

Total number of votes cast............................... 54,369

Delegates to the general conference of 1889 were elected at the same time and places, and the total number of votes cast for delegates was 58,839. The general conference of 1889, composed of delegates elected by the United Church, met in the York Opera House, in York, Pa., May 9 (Thursday), 1889. To this conference the church commission having charge of this work of revision under appointment of the general conference of 1885 reported the constitution and confession of faith, the plan under which it had been submitted to the members of the society, and the vote which had been cast under the plan of submission. This report was referred to a special committee, with direction to report to the conference whether the commission had acted in compliance with the instructions of the former general conference, and whether the vote had been regularly and orderly taken. That committee, on May 11, 1889, submitted a report commending the work of the commission, and recommending the ratification and adoption of the changes recommended by it. A minority report was at the same time submitted, complaining of certain irregularities in the methods of the commission. The report of the majority was adopted by a vote of 110 to 20 opposed. On the 13th of May, 1889, the proclamation of the bishops announcing the adoption of the work of the church commission was read to the conference, whereupon 15 of the 20 members who had opposed the adoption of the resolutions of the committee withdrew from the opera house, and met in another place, and, after organizing, adopted a resolution in these words:

"Inasmuch as 110 of the delegates and members of this general conference did, on May 11, 1889, vote to adopt a new constitution and confession of faith, and did, on the 13th of May, 1889, through the presiding bishop, declare the same in force, thereby forming a new church, we therefore declare that they have thereby vacated their seats as members of the general conference of the Church of the United Brethren in Christ of 1889, and that the alternates present from the respective conferences are entitled to seats in this body upon presentation of proper evidence that they are the duly-elected alternates."

Annual and quarterly conferences were subsequently organized by this minority element wherever members of the society were found who were willing to assume the attitude evidenced by the resolution above set out. These Radical annual conferences proceeded to elect trustees to hold church property in sympathy with their views. Thus, we have two distinct ecclesiastical organizations, bearing the same name, each claiming to be the original Church of the United Brethren

in Christ.    Many litigations have resulted from this division, which have reached the highest courts of several states, all of which have been decided adversely to the contention of the Radicals, with the exception of the litigation in the state courts of Michigan.    At the date of these proceedings there was an enrolled membership of about 204,000.    The total vote cast for the amended constitution was 50,658.    The disparity between the total nominal membership and the vote approving the amended constitution has been made the basis for claiming that this new constitution has been imposed upon the society by less than a majority of its membership.    The weight of this fact, as an element in the case, disappears in the light of the evidence that discussion preceded the election for about two years, and that the total vote against the constitution was only 3,659.    That there was an indisposition upon the part of the Radicals to give any sanction to the revisory proceedings by voting at all, is clear.    How strong was this nonvoting opposition?    Their greatest strength was shown by petitions to the general conference opposing any recognition of the work of the church commission.    Such petitions, signed by 16,882 members of the society, were presented to the general conference of 1889.    If these be added to the 3,659 who voted against the new constitution, we have a total opposition of 20,541, as opposed to 50,658 in favor of that instrument.    Two-thirds of a total reached by adding this outspoken opposition to those who actively announced their approval of the new constitution would be 47,466.    Thus the vote cast for the alteration of the constitution was more than two-thirds of all the members of the society who in any way expressed opinions upon a subject which had been agitated for many years.    The question of approving or disapproving the work of the church commission was carried into the election of delegates to the general conference of 1889. That election was held when the vote was taken upon that work. The total vote cast in the election of such delegates was 58,839, which was the largest vote ever cast in the history of the church.    The delegates thus elected stood, as shown by the vote cast upon the adoption of the resolutions approving and adopting the amended constitution and revised confession of faith, 110 for the work of the church commission to 20 opposed.    Of the opposition 5 yielded to the majority, and 15 withdrew.    The numerical strength of the membership which have adhered to the organization of the majority appears from the evidence to be proportionately as great or greater than those who support the minority delegates.    If it be assumed that at the date of the vote cast by the membership of this society the membership aggregated 204,000, as claimed, it is fairly inferable from the foregoing facts that a large majority of the whole number approve the alterations made in the constitution and the revision of the confession of faith.    The same facts justify the presumption that those who neither voted nor petitioned against these revisions intended thereby to indicate their acceptance of the action of those who did vote, and of the general conference elected at the same time.    But complainants say that neither the vote cast for the new constitution, nor the action of the general conference of 1889 in respect thereto, nor the general assent of the great mass of those enrolled as members who did not

vote at all, sanctions the changes which have been made in the old constitution and confession of faith. Their contention is that that constitution could not be changed except in strict pursuance of the method provided therein for an amendment or alteration thereof, and they deny that the steps taken to bring about an alteration of that constitution were such as were authorized by that instrument. Upon this premise they conclude that the majority who support the new constitution and revised confession of faith have thereby organized a new ecclesiastical organization, and have forfeited all right to the possession or control of the property owned by the original society, and that the remnant of the original organization which adheres to the old constitution and confession of faith constitute now the true organic succession to the old and original church, and are, therefore, entitled to the exclusive use of the name and exclusive possession of the church property.

It is unnecessary to consider the soundness of the deductions drawn by complainants, even if it should appear that the steps taken for the purpose of altering the organic law of the church were not in strict accord with the provisions of the constitution in respect to its own amendment. The constitution of 1841 was adopted by the general conference of that year. It was not authorized by any direct delegation of authority, nor sanctioned by any subsequent vote of the members. Nothing more clearly demonstrates the supreme authority claimed and exercised by the general conference than this fact: that it imposed a constitution and confession of faith upon the church without special authority theretofore conferred, or submitting its work for adoption or rejection by the membership. So far as the organic law thus enacted contains limitations upon the power of subsequent conferences in respect to the amendment or alteration of the constitution or creed, it is not a grant, but a limitation, of power. If it was within the constitutional power of the general conference of 1841 to enact a constitution, it was equally within the power of the general conference of 1885 or 1889 to alter or amend that constitution, unless the original power of the general conference had been limited by an instrument which was irrepealable by subsequent conferences, except in the manner and method prescribed by the limiting instrument. Why the conference of 1841 might enact a body of fundamental law which a subsequent conference could not repeal or amend was a problem which was much discussed by the membership. The membership had never ratified, or adopted, or been given any opportunity of expressing any opinion upon, the merits of that constitution. That it was generally accepted as a limitation and definition of the church fundamental law sufficiently appears. This acquiescence is relied upon as a sufficient indorsement to entitle it to be regarded as an irrepealable enactment, except by the steps provided by the instrument itself. But the provision touching its own amendment was framed in most inartificial language. It was as follows: "There shall be no alteration of the foregoing constitution unless by request of two-thirds of the whole society." Touching the confession, the constitution provided: "No rule or ordinance shall at any time be passed to change or do away with the confession of faith

as it now stands, nor to destroy the itinerant plan." This confession of faith had been formulated by an earlier general conference. But for this limitation upon the power of subsequent general conferences, there is no reason suggested why it was not subject to revision by virtue of the same authority which sanctioned its original formulation. It seems clear that the authority which could formulate a creed could revise it, and that this constitutional provision alone stood in the way of a revision by any general conference. It also follows that the authority which could alter or amend this constitution in any respect could amend or alter it in respect to the provision which protected the confession and itinerant plan from alteration or change. The constitution did not provide that the confession should be unalterable, but that it should be unalterable by any "rule or ordinance." This is a prohibition against any legislative change of the confession, and does not operate to place the confession and "itinerant plan" upon any higher plane than the constitution itself. What were the steps appropriate to an amendment of the constitution? This was the question which confronted the general conference. The provision limiting its power in this particular was not clear nor definite. Did the conference have any right to initiate an amendment? What was meant by "request of two-thirds of the society"? The clause needed interpretation. Should it be construed narrowly, and according to its letter, or according to its spirit, and with the end of ascertaining and carrying out the objects and purposes of a constitution? When framed, the church was a small body of people, and its wishes easily ascertained. In 1885 it had become a large body of people, scattered throughout the United States. The spirit of the limiting clause was that the conference should make no alteration in the constitution except in concurrence with the opinion and wish of "two-thirds of the society." To secure concurrence in opinions as to the desirability of a constitutional change required some legislative plan by which such opinion might be formulated, considered, and authoritatively expressed. Whether lay assent should precede or follow action by the conference was not of the essence of the matter. Neither was it vital that such lay concurrence should be indicated by vote or by petition. These were matters of discretion,—matters of detail,— and clearly within the general powers of the general conference as the highest judicatory and legislative body of the church.

Preliminary to any steps looking to alterations in the constitution, the general conference of 1885—a conference representing the whole church—found it necessary to construe this provision of its organic law, and did so by adopting a report of a committee appointed for the consideration of the whole subject of amending and revising the constitution and confession, which report affirmed that "the general conference had a right to institute measures looking to the amendment, modification, or change of the constitution." The same report recommended a plan for the formulation of proposed constitutional changes, and for the revision of the confession, and for the submission of such proposed changes to a vote of the entire membership of the church. That report went further. It provided how this vote should be taken, and its result ascertained, and provided that, if "two-thirds

of all the votes cast" should be cast in approval of the proposed changes and revision, the result should be announced by the bishops, and that thereupon "the confession of faith and constitution thus ratified and adopted shall become the fundamental belief and organic law of this church." This was a clear interpretation of the meaning of article 4 of the constitution. Put in short form, that conference construed that article as meaning that the general conference might, in its own way, and through its own instrumentalities, initiate alterations in the fundamental law of the church, and might institute means for obtaining the consent of the membership in respect to proposed changes, and that such consent might be given by vote, and that the vote of two-thirds of those voting at an election held for that purpose would be regarded and held as the assent or request of two-thirds of the society. The plan adopted for formulating proposed alterations did not, in terms, require that these changes should be submitted back to the conference which appointed the commission, nor to the next succeeding general conference. Indeed, the fair inference is that that conference did not intend that the work of the commission should be subjected to any further action by either that or the succeeding conferences, but should become effective as a consequence of the approval by two-thirds of the society of the work of the commission, when the result of the election should be verified, and proclaimed through and by the bishops of the church. This action of the conference of 1885 is objected to as erroneous upon these grounds: First, it is said that the conference erred in assuming any authority over the subject unless authorized previously by the request of two-thirds of the society; second, that the conference erred in construing the constitution so as to constitute two-thirds of the vote cast at the election authorized by it as the legal consent of two-thirds of the society, unless the vote cast for such changes numerically equaled two-thirds of the whole membership of the church; third, it is urged that to validly amend the constitution required not only the consent of two-thirds of the society, but that such consent must concur with the legislative action of the general conference, and that the conference of 1885 never did, as a legislative body, make any alterations or changes in either the constitution or confession, but provided that changes proposed by a committee of its own members should become operative when adopted by a two-thirds vote, and without any action whatever by any conference thereon. The conference of 1885 assumed, and, we think, rightfully, that it had jurisdiction to determine what steps might constitutionally be taken to initiate amendments of the existing constitution and a revision of the existing confession of faith. The constitution was, as we have seen, not a grant, but a limitation upon the powers of that judicatory. Manifestly, the general powers of the conference authorized it to construe the amendatory provision, and to provide the details by which this power of amendment might be exercised. Constitutions do not go into details. They seldom define the means by which a power is to be exercised. They merely grant, limit, or qualify powers. McCulloch v. Maryland, 4 Wheat. 405. The duty of interpreting and applying this provision of the organic law of the church was neces-

sarily within the implied powers of the general conference as the highest judicatory and legislative body of the organization. So in respect to a revision of the confession of faith. The existing confession had been formulated by a general conference prior to the adoption of any written body of organic law. It assumed that it had authority to decide this question, and to determine how, and to what extent, there might be a revision of the statement of the faith held by the church.

In respect to the objection that neither the constitution nor confession could be amended or altered except by the concurrent action of the conference and people, and the further objection that the general conference could not delegate its legislative power to the church commission, it is only necessary to say that no such question is presented. The church commission reported the proposed amendments and alterations in both, together with the vote thereon, to the general conference of 1889, before any announcement of the adoption thereof had been made by the bishops according to the plan of revision authorized by the conference of 1885. That conference was elected by the whole church, and represented both those favoring and those opposing the work of the commission. To say that that conference did not have jurisdiction to decide as to which of two constitutions and two confessions of faith was the constitution and confession of the church, is to assume that there was no ecclesiastical tribunal existing which could determine a question so vital as this to the welfare and ecclesiastical existence of the church. The action of the preceding conference was known. The commission created by its predecessor had reported its proceedings, and the result of the plan under which its work had been submitted to the whole membership of the church. For three years the work of this commission had agitated the church. Both the merit and the legality of that work were questioned. The very foundations of the church were threatened. The commission and the bishops had postponed any announcement of the consequences of what had been done until this conference should act. The commission reported its action and the vote, and asked the action of the conference thereon. The matter was submitted to a special committee, whose report was in these words:

"To the General Conference: Your committee to whom was referred the report to your body of the commission constituted by the general conference of four years ago, and charged with the duty of considering our present confession of faith and constitution, and of preparing such form of belief, and such amended fundamental rules for the government of this church in the future, as would, in their judgment, be best adapted to secure its growth and efficiency in the work of evangelizing the world, would beg to report as follows, viz.:

"(1) We have carefully examined the records of the proceedings of the commission, and find them fully and accurately kept, and indicating a thorough consideration of all matters involved in their work, with impartial purpose to reach only right conclusions.

"(2) We have also compared the instructions and limitations by the former general conference with their work as finally adopted by said commission, and find that said instructions and limitations were obeyed and carried out with commendable accuracy.

"(3) The 'Plan of Submission' we believe to have been in accord with the best methods of accomplishing the best results. Three years were given for

discussion and reflection by our people as to the merits of the two documents submitted for their final approval or disapproval. All reasonable efforts were employed to secure the largest possible attention to all whose right and duty it was to vote on the propositions submitted.

"(4) In view of the fact that the proceedings and acts of the commission have been found to be regular, and in accord with the directions given by the highest authority known to our church, your committee would recommend the adoption of the following, viz.:

'Resolved (1) by the general conference of the Church of the United Brethren in Christ, in quadrennial session assembled in the city of York, Pa., May 9, 1889, that the recorded proceedings of the commission, including the revised confession of faith and amended constitution, as formulated and submitted to the vote of the church, together with the methods of submission and all other acts by which the will of the church was ascertained thereon, are hereby approved and confirmed.

'(2) That because of the truth that the revised confession of faith and amended constitution as a whole, and all the separate propositions thereof, submitted to the membership of our church, have been adopted by more than the required two-thirds of all the votes cast thereon, as required by the general conference of 1885, it is hereby declared and published by this conference, and for itself, that the said revised confession of faith and amended constitution, as framed and submitted by the lawfully constituted commission of the church, are become the fundamental belief and organic law of the Church of the United Brethren in Christ, and will be in full force and effect on and after the 13th day of May, A. D. 1889. upon the proclamation of the bishops, as provided and ordered in the said amended constitution."

The report and the accompanying resolution were adopted by a vote of 110 to 20. This action was both judicial and legislative. It operated to adopt the new confession and new constitution, and adjudged that the vote theretofore taken was effective, under the constitution, as a "request" from "two-thirds of the society," and was a legal compliance with the old constitution, and that each should become effective when the announcement should be made by the bishops, as required by the plan adopted by the general conference of 1885. The authority conferred upon the church commission limited their power in respect to the revision of the confession of faith by providing: (1) That the commission should preserve, unchanged in substance, the confession of faith so far as it is clear; (2) that it should preserve the itinerant plan; (3) that it should "keep sacred the general usages and distinctive principles of the church on all great moral reforms as sustained by the Word of God, in so far as the province of their work may touch them." The conference of 1889, by adopting the report of their committee, to whom was referred the report of the church commission, adjudged and decided that the church commission had obeyed the instructions and limitations in respect to the changes made by them in the confession and constitution. Shall we review this decision? The commission was instructed to make no fundamental changes in the confession. The conference decided that they had obeyed this instruction. Still complainants urge this court to compare the old confession with the new, and for ourselves decide whether or not fundamental alterations have been made. This contention is pressed, notwithstanding the fact that in the long debate which preceded the adoption of the work of the commission not one word of objection was urged upon this account.

This brings us to the controlling question upon which our decision

must turn, namely: What effect will a civil court give to the interpretation and construction by the highest judicatory of an ecclesiastical body of its own fundamental law? Is that judgment subject to review in the civil courts? Or, will the civil courts accept the interpretation placed upon the organic law of the church by its highest judicatory, and apply the law so interpreted to the settlement of property questions depending upon that law? As we have already stated, the property here involved was not devoted by the express terms of any grant, gift, will, or sale to the support of any specific religious dogma, doctrine, or belief, but is property acquired by the church for the general use of the society for religious purposes, and with no other limitation. The property here in question is held for the particular use of a congregation, which is only one of numerous others united to form a general body of churches, and subject to the ecclesiastical control of the general conference, whose jurisdiction extends to all congregations composing the general body. The question here presented is merely one of identity,—which of the two bodies claiming to be the legitimate successor of the original united organization is the legal successor of the body to which this property was conveyed? When this question is answered, the property must be awarded to that organization. The decision of this question involves the interpretation of the organic law of the church in respect to the appropriate method of altering or amending that law. But that fundamental law has been construed, interpreted, and applied by the highest judicatory of this church before its division, and the very changes in the constitution and confession now complained of as irregular and revolutionary sanctioned and approved as having been made in accordance with the method prescribed by the fundamental law of the church for its own amendment. Shall we review that decision, and overturn its conclusiveness upon questions purely relating to ecclesiastical law and government, and take from the majority the general property of the church upon some difference of opinion as to whether the highest authority within the church had not mistaken the meaning of the church organic law? The question is not an open one in courts of the United States. It is the duty of this court under the law as settled to accept that decision as final, and as binding upon it in so far as that decision has application to the case for decision. This question was most thoroughly and elaborately considered by the supreme court of the United States in the leading case of Watson v. Jones, 13 Wall. 679–726. That case originated in a schism which occurred in the Presbyterian Church in respect to certain declarations made by its general assembly during the late Civil War touching the subjects of slavery and secession. One faction in the general church repudiated this action of the general assembly, as imposing unauthorized tests of membership in excess of its constitutional power and authority, while the other and larger party upheld its action, as within its ecclesiastical jurisdiction. The schism extended to the congregation whose property was involved in the case cited, and the decision depended upon the validity of this objectionable action of the general assembly. The supreme court, after conceding that there were certain very clear limits to the jurisdiction

of such a church judicatory as the general assembly of the Presbyterian Church, said:

"But it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character,—a matter over which the civil courts exercise no jurisdiction; a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required by them,—becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and in a sense often used in the courts all of those may be said to be questions of jurisdiction. But it is easy to see that, if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may and must be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, would open the way to all the evils which we have depicted as attendant upon the doctrine of Lord Eldon, and would, in effect, transfer to the civil courts, where property rights were concerned, the decision of all ecclesiastical questions."

After stating that the case then before the court involved property not devoted by the instrument under which it was held to the teaching of any particular doctrine or dogma, but property acquired by conveyance for the general use of a religious congregation which was one of many, united with others into a larger and general organization, and subject to the rule and control and bound by the judgments of a general assembly corresponding to the general conference of the United Brethren in Christ, and after stating that the schism which divided the congregation had resulted from a refusal to accept the final action and judgment of the general assembly, concluded by saying:

"In this class of cases we think the rule of action which should govern the civil courts, founded in the broad and sound view of the relations of church and state, under our system of laws, and supported by a preponderating weight of judicial authority, is that whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them. * * * In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent, and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts, and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals

as the organism itself provides for. Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian Churches) has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would, therefore, be an appeal from the more learned tribunal in the law which should decide the case to one which is less so."

The doctrine of this case has been accepted and applied by the highest courts of many states of this Union. Among these cases may be noticed: Nance v. Busby, 91 Tenn. 303, 18 S. W. 874; White Lick Quarterly Meeting of Friends v. White Lick Quarterly Meeting of Friends, 89 Ind. 136; Connitt v. Reformed Protestant Dutch Church, 54 N. Y. 551; Harrison v. Hoyle, 24 Ohio St. 254.

The same questions here presented, and upon substantially the same record, have been decided against the complainants in the courts of several states within which church property was in controversy: Lamb v. Cain, 129 Ind. 486, 29 N. E. 13; Rike v. Floyd, 6 Ohio Cir. Ct. R. 80, affirmed by supreme court, 53 Ohio St. 653, 44 N. E. 1136; Kuns v. Robertson, 154 Ill. 394, 40 N. E. 343; Schlichter v. Keiter, 156 Pa. St. 119, 27 Atl. 45; Philomath College v. Wyatt, 27 Or. 390, 31 Pac. 206, and 37 Pac. 1022.

The case of Watson v. Jones is of binding and conclusive authority upon this court. There can be no doubt that the facts of this record bring this case distinctly and unequivocally within the principles of that case. We have not, therefore, deemed it necessary to consider very fully the ruling and judgment of the conference of 1885 or 1889 upon their merits, though our silence in regard thereto is not to be taken as in any degree indicating doubt as to the intrinsic rightness of their interpretation of the constitutional law of the church. We accept, however, the judgment of the conference of 1889 as final and binding upon this court. It follows, therefore, that organic succession and order is with the majority, who accepted the new constitution, and the property here in question is properly held and controlled by trustees appointed by the ecclesiastical organization entitled to control. The decree of the circuit court must be affirmed.